**Lloyd HAMMONDS, Plaintiff,**

v.

**AETNA CASUALTY & SURETY COM-
PANY, Defendant.**

No. C64–736.

United States District Court
N. D. Ohio, E. D.

July 26, 1965.

Sheldon R. Walker, Willoughby, Ohio, Edward H. Stinson, Cleveland, Ohio, for plaintiff.

Arter, Hadden, Wykoff & Van Duzer, Smith Warder, Eugene Bleiweiss, Cleveland, Ohio, for defendant.

CONNELL, Chief Judge.

Plaintiff has complained that the defendant insurance company, without just cause, had persuaded the plaintiff's treating physician to discontinue that relationship, and, further, that the defendant induced the doctor to divulge confidential information gained through the physician-patient relationship. In particular, it is alleged that the defendant, at the behest of a prominent defense attorney, persuaded Dr. Alexander Ling, the plaintiff's treating physician, to surrender certain undisclosed confidential information for use in pending litigation against the plaintiff on the false pretext that the plaintiff was contemplating a malpractice suit against Dr. Ling. We overruled the defendant's Motion to Dismiss on January 6, 1965, 237 F.Supp. 96,

holding that the alleged misconduct, if proven true, would require the defendant to respond in damages to the plaintiff. The defendant has now moved for a summary judgment, contending that the operative facts are not in controversy and that the defendant is entitled to judgment as a matter of law. Attached to the Motion for Summary Judgment is an "Appendix" in which the defendant again challenges the wisdom of the Court's earlier opinion in support of the order overruling the Motion to Dismiss. We recognize this "Appendix" as a Motion for Reconsideration of that opinion, and therefore we will give first attention to this Motion before addressing the defendant's prayer for summary judgment.

I.

The motion for reconsideration is directed to that part of the Court's opinion (237 F.Supp. 96, 101–102) dealing with the alleged inducement of the physician's breach of his duty to secrecy. The vigor with which counsel for defense (who are regularly concerned with the legal responsibilities of the medical profession) advance the argument that a physician may reveal information gained in confidence, requires that we re-emphasize the reasons underlying our first Memorandum. The defendant argues that, since there was no common law privilege clothing communications between doctor and patient with confidentiality, there can be no common law action for the breach of confidence[1] nor

---

1. We agree with the defendant's view of the English common law, which affords the patient no expectation of privacy. 1 Taylor's Principles and Practices of Medical Jurisprudence, 21–23 (10th Ed.1948):

 "Some medical men have claimed a privilege not to answer certain questions which are put to them in a court of law on the ground that the matters have come to their knowledge through private and confidential communications with their patients. The law concedes no such special privilege of this nature * * *

 "The law of England on this important subject undoubtedly conflicts with the law of honour sought to be observed by medical men * * * that information obtained in the consulting-room from patients relative to their ailments must be held to be inviolably secret."

 But the saga of American jurisprudence has recorded many trying triumphs over the inadequacies of the English common law, and the seal placed over the physician's lips, when tempted to discuss his patient's affairs in private conversation, is one of these proud achievements.

for the inducement of such a breach. The privileged communication statute, according to the defendant, merely precludes a doctor from testifying in court as to communications received while treating a patient; as far as the law and the statute are concerned, the doctor is uninhibited in his private discussions about his patient[2] and the insurance company is perfectly free to promote a full discussion in private of any communication made by the patient to the doctor. The defendant has thus illustrated its total failure to grasp the basis of the Court's earlier opinion in this case. Modern public policy, not the archiac whims of the common law, demands that doctors obey their implied promise of secrecy.

This is not the first time, nor will it be the last, that a court, confronted with a unique situation, must, after an unsuccessful search for binding precedent on point, repair to the dictates of public policy to do justice between litigants at the bar of justice. What is the meaning of "public policy?" As stated by the Ohio Supreme Court in The Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney, 95 Ohio St. 64, 68, 115 N.E. 505, L.R.A.1917D, 641 (1916):

"In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellowmen, having due regard to all the circumstances of each particular relation and situation.

"Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man.

\* \* \* \* \* \*

"When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court.

"It has frequently been said that such public policy, is a composite of constitutional provisions, statutes, and judicial decisions, and

2. To support this argument the defendant relies upon the following passage from DeWitt, Privileged Communications Between Physician & Patient 23 (1958):
 "It is manifest, of course, that a voluntary disclosure by the physician of medical confidences gained while attending the patient—when not made in the course of his professional duty—is a plain violation of medical ethics and professional propriety, but the physician-patient privilege statute does not prescribe a rule of conduct for the government of physicians in their general intercourse with society. Therefore, if the physician, disregarding the ethical duty of secrecy, should, in conversation or otherwise, reveal the intimate confidences of the patient, he would not violate the statute however reprehensible his conduct would be. As far as the statute goes, the physician may talk about the ailments of the patient from New York to San Francisco and to every Tom, Dick and Harry on the street or in his club, since the statute merely permits the patient, or the holder of the privilege, to seal the lips of the physician against testifying in a judicial proceeding, or an investigation authorized by law, and is wholly ineffectual to prevent a public disclosure elsewhere."
 A careful reading of that passage and the context from which it is taken indicates, however, that Professor DeWitt did not imply that *no* action would lie for a private breach of confidence; he merely opined that the statute by itself was not intended to fashion such a civil remedy. As we shall point out, infra, (P. 802) the author has elsewhere expressed a viewpoint quite compatible with the Court's earlier Memorandum.

some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination.

\* \* \* \* \* \*

"Public policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them."

■ We see this concomitant policy reflected in three separate indicia: the promulgated code of ethics adopted by the medical profession on which the public has a right to rely; the privileged communication statute, which precludes the doctor from testifying in open court; and that part of the State Medical Licensing Statute which seals the doctor's lips in private conversation.

In all medical jurisprudence there are few problems which have deserved and received more concentrated attention than the protection of the personal information which a patient remits to his physician. This relationship "is one of trust and confidence. It is submitted that the best interest of the patient is served in trusting his welfare to the skill and industry of his physician." Regan, Doctor and Patient and the Law, 113 (1956). To foster the best interest of the patient and to insure a climate most favorable to a complete recovery, men of medicine have urged that patients be totally frank in their discussions with their physicians. To encourage the desired candor, men of law have formulated a strong policy of confidentiality to assure patients that only they themselves may unlock the doctor's silence in regard to those private disclosures. The result which these joint efforts of

the two professions have produced, and which we recognized in our earlier opinion, has been urged or forecast *in una voce* by commentators in the field of medical jurisprudence. Stetler & Moritz, Doctor and Patient and the Law, 269–273 (1962); Regan, supra; Shartel & Plant, Law of Medical Practice, 48–50, 162, 178–180 (1959); DeWitt, Physician in the Courtroom, Medical Ethics and the Law: The Conflict Between Dual Allegiances, p. 33 (1954); Chafee, Privileged Communications: Is Justice Served Or Obstructed By Closing the Doctor's Mouth On the Witness Stand?, 52 Yale Law Journal, 606, 616 (1943). To these commentators, the Court's earlier ruling comes as no surprise.

■ The defendant generously concedes that the Hippocratic Oath embodies some restriction on a doctor's right to discuss the condition of, and communications from, his patient. The Oath of Hippocrates, in so far as here pertinent, provides:

"Whatever in connection with my professional practice or not in connection with it I see or hear in the life of men which ought not to be spoken abroad I will not divulge as recommending that all such should be kept secret."

We agree with the defendant that there are some situations [3] where divulgence will inure to the benefit of the public at large or even to the patient himself, but we have no such situation before us. The plaintiff here was engaged in litigation for an injury (which Dr. Ling was treating) allegedly sustained at the negligent hand of the Euclid-Glenville Hospital, which was represented by an attorney for whom the defendant here allegedly secured confidential informa-

---

3. For example, where a doctor discovers that his patient is afflicted with a communicable disease, he must report that fact to proper health authorities. In Ohio he is specifically absolved by statute from any liability for such disclosure. Ohio Rev.Code § 3701.26.1 (effective Oct. 9, 1959). When a doctor discovers that

one of the parties to a contemplated marriage has contracted a venereal disease, he may, without fear of legal ramifications, make that fact known to certain specified persons. Ohio Rev.Code § 4731.22. Some jurisdictions require that doctors report all wounds inflicted by bullet, knife or other weapon.

tion from Dr. Ling. In this adversary judicial system, with its intensity heightened by the continuing friction between insurance companies and claimants, is there no impropriety in a doctor discussing the case of his patient-plaintiff with the lawyer for the defending insurance company? Who would dare say so?

The defendant has criticized the Court's application of the language in the licensing statute to the case at bar. For this argument defendant cites McPheeters v. Board of Medical Examiners, 103 Cal.App. 297, 284 P. 938 (1930), where the court held that the phrase "Willful betrayal of professional secret" did not apply to all disclosures which a physician may intentionally make. In restoring the license of the petitioning doctor, the court held that the above phrase required a showing of deliberate intent to do injury rather than merely an intentional disclosure of a confidence. In that case the physician had written letters to a former assistant who was acquainted with his patients and familiar with their ailments; the letters contained information on the type of operations the doctor had performed, the condition of some of his patients and the progress of their recoveries. The letters contained nothing which would in any way tend to disgrace, embarrass or incriminate any of the patients. The court held that the phrase in question "willful [betrayal] of a professional secret"—

" * * * implies a deliberate intention for which no reasonable excuse can be given to do or refrain from doing some act which good faith in the performance of some duty requires, as the case may be. It further implies that there must be some design or purpose and intent to do an injury. The word sometimes means 'with a bad purpose and with the intention designedly and purposely to cause injury.' So it has been held that an act, though intentional, is not willful unless done with a wrongful purpose, or with the

design to injure another, or committed out of mere wantonness or lawlessness." 284 P. 938, 939.

Finding no wrongful purpose in the doctor's disclosure, the court found that he had not violated the Medical Practice Act, and accordingly returned his license to him.

■ We are now urged by the defendant, that since Dr. Ling's divulgence was not motivated by a malicious purpose, he did not run afoul of the policy expressed in our own Medical Licensing Statute. We need no California court, obviously straining to rationalize a decision already reached, to define for us the term "willful betrayal." The word "willful" imports an action born of purpose rather than inadvertence; "betrayal" means simply the surrendering of information held in trust for another. There need be no malicious motive, no intent to inflict injury, but merely the purposeful divulgence of that which was thought to be confidential.

■ In analyzing the facts in the McPheeters case, it becomes apparent that the court was anxious to effect an equitable result from a difficult situation. The court there was concerned with the prospect of the doctor being permanently deprived of his license to heal, for which he had studied and trained so arduously, because of some innocent though ill-advised disclosures made to his former nurse. These were offhand remarks made in letters of intimate correspondence and were certainly intended to pass no further than the eye of the reader. That is not our case at all. According to the allegations of the complaint, which we must accept as true for present purposes, Dr. Ling was the innocent dupe of his insurance carrier. The alleged disclosures, however, were not intended to stop at the ear of the doctor's confidante; they were to be used in litigation against the patient. Thus, even if Dr. Ling's innocent though ill-advised divulgence was as much the product of a pure heart as was that of Dr. McPheeters, the pur-

pose for which the information was secured here was directly inimical to the best interests of the patient.

 It cannot be questioned that part of a doctor's duty of total care requires him to offer his medical testimony on behalf of his patient if the patient becomes involved in litigation over the injury or illness which the doctor treated. Thus, during the course of such litigation, in addition to the duty of secrecy, there arises the duty of undivided loyalty. Should a doctor breach either of these two duties, the law must afford the patient some legal recourse against such perfidy. We should not suffer a wrong without a remedy, especially when the wrong complained of involves the abuse of a fiduciary position.

Recently the Superior Court of Pennsylvania expressed great displeasure with a doctor who, operating as an agent of insurance companies, induced a fellow doctor to breach his duty of secrecy and surrender pertinent information to the defense without first gaining the plaintiff's permission. In Alexander v. Knight, 197 Pa.Super. 79, 177 A.2d 142 (1962), a Dr. Murtagh had examined and treated one of the plaintiffs shortly after the accident upon which suit was brought. Prior to trial, a Dr. Ezickson, a physician who was employed by defense attorneys to interview doctors of injured plaintiffs and secure reports from them, had secured such a report from Dr. Murtagh and paid $50 for it. This report was given despite the fact that Dr. Murtagh had not even attempted to obtain the plaintiff-patient's consent to give any report or information to the defense. The court criticized this misconduct in the following language:

> "We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty to conscience to speak the truth; he need, however, speak only at the proper time. Dr. Ezickson's role in inducing Dr. Murtagh's breach of his confidential relationship to his own patient is to be and is condemned."

Although the misconduct of these doctors was not critically at issue in this case, the above quoted language indicates how the Pennsylvania court would treat the allegations which the plaintiff here has made.

██ ██ Defendant relies, in part, on Hague v. Williams, 37 N.J. 328, 181 A.2d 345 (1962), an action by the parents of an infant against a doctor for disclosing to an insurer to whom the parents had applied for life insurance on the infant that the child had had heart trouble since birth. As a result of the doctor's disclosure, the parents were denied recovery on the policy, and brought suit against the doctor for wrongful divulgence of confidential communication. The New Jersey Supreme Court held that "[w]hen plaintiffs made a claim involving the health of the patient, they lost any right to non-disclosure they may have had" (181 A.2d p. 349) and accordingly affirmed the dismissal of the action. The court did recognize, however—

> "A patient should be entitled to freely disclose his symptoms and condition to his doctor in order to receive proper treatment without fear that those facts may become public property. Only thus can the purpose of the relationship be fulfilled. So here, when the plaintiffs contracted with defendant for services to be performed for their infant child, he was under a general duty not to disclose frivolously the information received from them, or from an examination of the patient.

"This is not to say that the patient enjoys an absolute right, but rather that he possesses a limited right against such disclosure, subject to exceptions prompted by the supervening interest of society. We conclude, therefore, that ordinarily a physician receives information relating to a patient's health in a confidential capacity and should not disclose such information without the patient's consent, except where the public interest or the private interest of the patient so demands."

This right of non-disclosure was acknowledged even though New Jersey has no statute creating a testimonial privilege, nor does the medical licensing statute proscribe against the betrayal of confidential information. (Cf. N.J.Stat. Anno. 45:9–16 (1963)). As the court stated:

"We have, then, no expressed public policy pointing to a general prohibition against testimonial revelation of information acquired during the physician-patient relationship, but, on the contrary, our policy is to expose such information to view when it is relevant to the resolution of litigation."

Thus, in so far as New Jersey recognizes that an action will lie for an inexcusable divulgence of a confidence, we are in agreement. But in so far as New Jersey holds that where the physical condition of a patient becomes the subject of a claim, the doctor is allowed a full and free disclosure in private to his patient's adversary, we find that this is wholly incompatible with the public policy of Ohio. Accordingly, the holding in Hague is entitled to little weight here. We recognize that the institution of a suit for the compensatory value of personal injury will necessarily lead to the ultimate waiver of privilege; thus it has

been held that the privilege will not prevent pre-trial discovery of medical evidence with respect to which it is expected that the plaintiff would waive the privilege at trial. The accelerated disclosure of the treating physician's opinion as to the extent of a plaintiff's injury does not permit a clandestine conference between that doctor and the lawyer for his patient's adversary.

■ The four reported cases [4] upon which this Court relied in part in arriving at our earlier holding were discussed and rejected by the New Jersey Supreme Court in Hague. It is interesting to note here why they were rejected by that court:

"The first three enumerated opinions generally recognize a right of action similar to that here brought. However, in each of the States in which said actions were brought there were statutes preventing a doctor from testifying in court as to communications received from a patient. Hence there existed an established public policy recognizing a confidential relationship."

After analyzing those three cases, the court concluded, as the defendant here emphasizes, that "[t]hese cases, therefore, are not authority for the proposition for which they are cited." This, however, does not dissuade us from our earlier view because this Court would not recognize the position which the plaintiff in Hague sought to establish on the strength of these authorities:

"Plaintiff has cited only four cases in support of his contention that a patient has an *absolute* privilege against *any* authorized extrajudicial disclosure of information obtained from or about him by his physician" (emphasis added).

We recognize that the right of privacy and the duty of secrecy are limited by

4. Simonsen v. Swenson, 104 Neb. 224, 177 N.W. 831, 9 A.L.R. 1250 (Sup.Ct.1920); Smith v. Driscoll, 94 Wash. 441, 162 P. 575, L.R.A.1917C, 1128 (Sup.Ct.1917); Clark v. Geraci, 208 N.Y.S.2d 564 (Sup. Ct.1960); Berry v. Moench, 8 Utah 2d 191, 331 P.2d 814, 73 A.L.R.2d 315 (Sup. Ct.1958).

considerations of public policy. (Cf. f. n. 3) We do not recognize an *absolute* privilege; we hold that the situation drawn by the allegations of the complaint here is repugnant to the public policy of Ohio, and therefore may be the subject of a valid cause of action.

 The defendant proffers further criticism of the authority quoted in the Court's earlier opinion. While generously granting that these cases contain dicta which indicate that an action *might* lie under certain circumstances, the defendant is quick to point out that all of these cases ended in results favorable to the defendants. This has no bearing upon us here. The inability to adduce evidence sufficient to carry the burden of persuasion lends no discredit to the legal theory upon which a plaintiff proceeds. The plaintiff here has alleged that the defendant, by falsely informing the treating physician that a malpractice claim was impending against him, induced that doctor to surrender his records to the very lawyer who was defending against the patient's claim. Against a motion to dismiss the complaint, we must assume the truth of these allegations and we address ourselves solely to the validity of the legal theory which the plaintiff has advanced. We repeat here the stinging, yet sagacious, remark of the Supreme Court of Washington in Smith v. Driscoll, 94 Wash. 441,. 162 P. 572, 573, L.R.A.1917C, 1128 (1917):

> "Neither is it necessary to pursue at length the inquiry of whether a cause of action lies in favor of a patient against a physician for wrongfully divulging confidential communications. For purposes of what we shall say it will be assumed that, for so palpable a wrong, the law provides a remedy."

We repeat here our earlier finding that a doctor who makes an unauthorized divulgence of confidence should respond in damages.

 Any time a doctor undertakes the treatment of a patient, and the consensual relationship of physician and patient is established, two jural obligations (of significance here) are simultaneously assumed by the doctor. Doctor and patient enter into a simple contract, the patient hoping that he will be cured and the doctor optimistically assuming that he will be compensated. As an implied condition of that contract, this Court is of the opinion that the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission. Almost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, and every patient has a right to rely upon this warranty of silence. The promise of secrecy is as much an express warranty as the advertisement of a commercial entrepreneur. Consequently, when a doctor breaches his duty of secrecy, he is in violation of part of his obligations under the contract.

When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more important or more intimate to man than the health of his mind and body. Since the layman is unfamiliar with the road to recovery, he cannot sift the circumstances of his life and habits to determine what is information pertinent to his health. As a consequence, he must disclose all information in his consultations with his doctor—even that which is embarrassing, disgraceful or incriminating. To promote full disclosure, the medical profession extends the promise of secrecy referred to above. The candor which this promise elicits is necessary to the effective pursuit of health; there can be no reticence, no reservation, no reluctance when patients discuss their problems with their doctors. But the disclosure is certainly intended to be private. If a doctor should reveal any of these confidences, he surely effects an invasion of the privacy of his patient. We are of the opinion that the preservation of the patient's privacy is no mere ethical duty upon the part of the doctor; there

is a legal duty as well. The unauthorized revelation of medical secrets, or *any* confidential communication given in the course of treatment, is tortious conduct which may be the basis for an action in damages.

Our analysis of the sparse authority available and our application of the principles upon which these cases were predicated are compatible with views expressed by the most esteemed commentators in the field of medical jurisprudence. Professor DeWitt, writing in 5 W.R.U. Law Rev. 5, 19–23 (1953), reproduced in Physician in the Courtroom, Medical Ethics and the Law: The Conflict Between Dual Allegiances, p. 33 (1954) reviews the reported cases and arrives at the same conclusion which we have drawn. As he points out (at p. 23): "[t]he novelty of the situation presents no obstacle to recovery, since the law will not suffer an injury and a damage without a remedy."

In Stetler and Moritz, Doctor and Patient and the Law, 4th Ed. (1962) the authors have set out to fashion rules of conduct for doctors which will keep them free from legal entanglements. In discussing the legal aspects of unauthorized disclosure of confidential information, the authors review the history of the doctor's duty of secrecy, recount the enactment of testimonial privilege and licensing statutes, analyze the reported cases, and conclude that:

> "The belief that the law offers the patient no protection against unauthorized disclosures has created confusion concerning a physician's civil liability for such disclosures. Although only a few cases have been found which directly deal with this issue, they indicate that a wrongful disclosure may give rise to a civil action for damages directly caused by the violation of confidence.

> \* \* \* \* \* \*

> "Although the law in the area of confidential communications cannot be considered as settled, the reported cases do indicate a trend toward allowing the patient to bring an action for damages caused by a willful violation of confidence in the states that punish such conduct by revocation of a medical license."

From all these authorities, both primary and secondary, we draw the necessary conclusion that a doctor may be legally culpable for an intentional, unauthorized divulgence of confidences.

## II.

However, we are not critically concerned here solely with an alleged disclosure by a doctor since the complaint accuses Dr. Ling only of a misfeasance predicated upon misinformation and directs its plea for redress not against the doctor but against the defendant insurance company which allegedly supplied this inaccurate information. The defendant here has also challenged, in its Motion for Reconsideration, the Court's finding that one who induces a physician's treachery may also be held liable for damages. This finding was predicated upon the holding that the physician-patient relationship is a confidential one which imposes fiduciary obligations upon the physician. As we have noted above, the patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well. The introduction into the relationship of this aura of trust, and the expectation of confidentiality which results therefrom, imposes the fiduciary obligations upon the doctor. As a consequence, all reported cases dealing with this point hold that the relationship of physician and patient is a fiduciary one. Lilly v. Commissioner, 188 F.2d 269 (4th Cir. 1951), rev'd on other grds., 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769 (1952); Stacey v. Pantano, 177 Neb. 694, 131 N.W.2d 163 (1964); Hewett v. Bullard, 258 N.C. 347, 128 S.E.2d 411 (1962); In re Hendricks' Estate, 110 N.W.2d 417 (Sup.Ct.N.D. 1962); Mattingley v. Sisler, 198 Okl. 107, 175 P.2d 796 (1948); Batty v. Arizona State Dental Board, 57 Ariz. 239, 112 P.2d 870 (1941); Foster v. Brady, 198 Wash. 13, 86 P.2d 760 (1939); Davis

v. Rodman, 147 Ark. 385, 227 S.W. 612 (1921); Ulbrand v. Bennett, 83 Or. 557, 163 P. 445 (1917); Alexander v. Knight, supra; Allison v. Blewett, 348 S.W. 2d 182 (Tex.Civ.App.1961); Moore v. Webb, 345 S.W.2d 239 (Mo.App.1961); Cf. also, 42 Ohio Jur.2d, Physicians and Surgeons, § 106 (1960).

If the analogy expressed in the Court's earlier opinion (comparing the relationship of physician and patient to that of trustee and principal and comparing the confidences exchanged between doctor and patient to a trust *res*) is offensive to the defendant, it comes as no surprise to the medical profession. The Code of Medical Ethics itself recommends the following attitude:

> "The confidences * * * should be held as a trust and should never be revealed except when imperatively required by the laws of the state." Principles of Medical Ethics of A.M.A. Ch. II, § 1 (1943).

Nor does the imposition of a trustee's duties upon a physician as a fiduciary fashion any new doctrine in American jurisprudence. By its very definition, the term "fiduciary relationship" imports the notion that "[i]f a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the *cestui que trust*." Hivick v. Urschel, 171 Okl. 17, 40 P.2d 1077, 1080 (1935). Cf. also, Green v. Frazier, 242 Miss. 315, 135 So.2d 399 (1961); Rees v. Briscoe, 315 P.2d 758, 759 (Sup.Ct.Okl.1957); Klika v. Albert Wenzlick Real Estate Co., 150 S.W.2d 18, 24 (Mo.App.1941); City of Boston v. Santosuosso, 307 Mass. 302, 30 N.E.2d 278, 288 (1940); Van Sickle v. Keck, 42 N.M. 450, 81 P.2d 707, 717 (1931); Niland v. Kennedy, 316 Ill. 253, 147 N.E. 117, 119 (1925). Therefore it is readily apparent that the legal obligations of a trustee are imposed upon any person operating in a fiduciary capacity and the same principles of law governing the behavior of a trustee are applicable to all fiduciaries.

It also follows that the same principles of law governing third party participation in breaches of trust must also apply to one who participates in or induces the breach of any fiduciary duty. The law is settled in Ohio and elsewhere that a third party who induces a breach of a trustee's duty of loyalty, or participates in such a breach, or knowingly accepts any benefit from such a breach, becomes directly liable to the aggrieved party. Shuster v. North American Mortgage Loan Co., 139 Ohio St. 315, 40 N.E. 2d 130 (1942); In Re The Van Sweringen Co., 119 F.2d 231, 234 (6th Cir. 1941); 2 Restatement of Trusts, § 326 (2d Ed. 1959); Scott, Participation in Breach of Trust, 38 Trust Bull. 41 (Dec. 1958). Therefore, we reaffirm our earlier finding that when one induces a doctor to divulge confidential information in violation of that doctor's legal responsibility to his patient, the third party may also be held liable in damages to the patient.

The defendant's Motion for Reconsideration of the Court's earlier opinion is accordingly overruled.

### III.

In support of its Motion for Summary Judgment the defendant first presents evidence in defense of the claim that it induced Dr. Ling to terminate his contractual relationship with the plaintiff. Before appraising the significance of that evidence, we must first illuminate a misapprehension which appears in the Court's earlier Memorandum. In rejecting the defendant's argument that its meddling conduct was privileged because the defendant sought to protect against a danger to a present economic interest of its own, we stated by way of parenthetical dictum:

> "But, according to the allegations of the complaint, there was no action threatened or contemplated against the treating physician; consequently there was no threat to an existing economic interest of the defendant. On the contrary, it appears that the only interest which the defendant had was to secure an unfair advantage in a lawsuit against its other

insured, Euclid-Glenville Hospital. It is unfortunate that the same insurance company, represented by the same lawyer, bears the risk both for liability incurred by the hospital's negligence and for liability incurred by a doctor's malpractice. This affords the attorney a position of proximity from which he may, as alleged here, negate the expectation of confidentiality in the lawsuit against the hospital by suggesting to the doctor that he will be exposed to liability even though a complaint has been directed only against the hospital." 237 F.Supp. 96, 100.

Through depositions and affidavits now on file with the Court, it has become clear that the defendant in the original lawsuit, Euclid-Glenville Hospital, was insured by U. S. Fidelity & Guaranty Company, while defendant Aetna carried the malpractice insurance on Dr. Ling. Thus the accusation that the defendant plied one assured with misinformation to secure from him the means to an unfair advantage for another insured is without foundation. (The confusion no doubt arose because the same counsel represented both Euclid-Glenville Hospital on behalf of U. S. Fidelity & Guaranty Company, and Dr. Ling on behalf of the Aetna). This is reflected in the affidavits of Attorney Frank Edwards, who heads the Claim Office of the defendant, and Mr. Smith Warder, trial counsel for the defendant. This is not dispositive of the issue however. If the defendant seeks to justify any participation in the rupture of the contractual relationship between the plaintiff and Dr. Ling, it must be shown that that conduct was in response to an *immediate* danger to an existing economic interest of its own.

The evidence, uncontroverted thus far, indicates that Dr. Ling made the first contact between himself and the defendant when giving written notice (as re-quired under the contract of insurance) of a potential malpractice claim against him by the plaintiff. The defendant contends that only then did it advise its assured to discontinue further treatment.

This brings into issue the propriety of advising the doctor to discontinue treatment before a malpractice claim is made. In our earlier Memorandum we expressed the opinion that "even if it had a protectable interest endangered, we think public policy forbids such interference with the doctor-patient relationship unless and until suit is brought by plaintiff against the doctor." Thus the problem is a question of timing: When is a doctor legally free to discontinue treatment,[5] when may a doctor freely discuss with his lawyer the medical secrets of his patient, and when may an insurance company advise its assured to pursue either course? We think that the spirit of our earlier dictum is proper —an insurer may persuade a doctor to discontinue treatment only after the *claimant* knows or suspects that he is the victim of medical malpractice and has expressed an intent to pursue his legal rights. Only then is there a present danger to the insured's interest. This is perfectly illustrated by the facts as alleged in the instant case: because no claim was made against the doctor nor any lawsuit filed against the doctor, and the time provided by the statute of limitations has expired, there never was nor can there ever be an *immediate* danger that the defendant would undertake the risk involved in its policy. The danger of a lawsuit does not arise when a doctor suspects his own misfeasance; the danger arises only when the patient so suspects. If there be no claimant, there can be no lawsuit, no claim, no danger to the defendant's economic interest. Therefore we hold that an insurance company may not induce, suggest or persuade a doctor to disrupt the treatment

---

5. The law is clearly established as to a doctor's duty of continuing treatment. The doctor may leave on his own motion only after the patient has been afforded seasonable notice and has had an adequate opportunity to secure other medical attention. Morningstar v. Jones, 31 Ohio L.Abs. 440, 446 (Ohio App.1940).

of his patient and to discuss the medical history of his patient unless and until there is a reasonable basis to believe that a claim for malpractice will be made against the doctor.

The defendant argues that a doctor who suspects the advent of a malpractice claim must not be forced to wait, in mute suspension, the filing of a lawsuit against him or the notice of a claim against him.[6] It is argued that this affords the plaintiff an unfair advantage to fully prepare his case while the doctor is proscribed against the first defensive measure. This is the first time that anyone has seriously argued that a plaintiff has any advantage in a malpractice case. We agree that to await the filing of a lawsuit is unnecessary; the doctor must only await the notice of a claim against him. Only when a patient expresses an intent to place in issue the doctor's conduct in the course of treatment does there arise an immediate threat to an insurer's economic interest; only at that point does there arise the privilege on the part of the insurance company to advise the doctor to breach his contractual obligations and to desist from further treatment. Inasmuch as the evidence proffered by the defendant fails to indicate that there was ever an affirmative gesture from the plaintiff implying an intent to make such a claim, defendant's Motion for Summary Judgment against plaintiff's First Cause of Action is overruled.

In defense of the plaintiff's claim that defendant induced a breach of confidence, defendant has introduced a defense of waiver, predicated upon a medical records-deposition. This defense cannot prevail for two reasons. First, it presupposes that the only disclosure which Dr. Ling made to the defendant was through the remittal of these records. The allegations of the complaint are not so narrowly drawn, nor is there any testimony negating the averment that the defendant gathered "*all* medical information concerning the complaint connected with the lawsuit against Euclid-Glenville Hospital * *." (Cf. p. 3 of Complaint) Until there is testimony from the doctor, we have only the self-serving declarations of the defendant through its officer and attorney that no other information passed from the doctor to the defendant. This is hardly the basis for a summary judgment in the defendant's favor.

Second, assuming, but without deciding, that the plaintiff waived the testimonial privilege because of the deposition, this "waiver" does not authorize a private conference between doctor and defense lawyer. It is one thing to say that a doctor may be examined and cross-examined by the defense in a courtroom, in conformity with the rules of evidence, with the vigilant surveillance of plaintiff's counsel, and the careful scrutiny of the trial judge; it is quite another matter to permit, as alleged here, an unsupervised conversation between the doctor and his patient's protagonist. It is the opinion of this Court that the mere waiver of a testimonial privilege does not release the doctor from his duty of secrecy and from his duty of loyalty in litigation, and no one may be permitted to induce the breach of these duties.

Inasmuch as we have had no evidence from the doctor as yet, and the defendant has retained new counsel, we deem it advisable to defer a ruling on the defendant's Motion for Summary Judgment on the Second Cause of Action until such time as counsel has had an opportunity to gather evidence which will indicate the extent and nature of the disclosures.

---

6. The defendant argues that a doctor should be entitled to consult an attorney at any time, especially when he recognizes the possibility of a malpractice claim. This may be true, but at *no* time should he be permitted to discuss his patient's injury, condition or confidences with the attorney who is defending his patient's claim. If the patient is embroiled in litigation for an injury which the doctor has treated, and which could not be the subject of a malpractice claim, the duty of loyalty in litigation (*cf.* p. 8, supra) survives not only the suspicion of a malpractice claim, but also the actual notice of such a claim.