446 S.E.2d 648

**Dale F. MORRIS, Plaintiff Below,**

v.

**CONSOLIDATION COAL COMPANY, et al., Defendants Below.**

and

**Dale F. MORRIS, Plaintiff Below,**

v.

**CONSOLIDATION COAL COMPANY, et al., Defendants Below.**

Nos. 22034, 22035.

Supreme Court of Appeals of West Virginia.

Submitted March 8, 1994.

Rehearing Denied July 18, 1994.

Filed as Modified July 18, 1994.

Brent E. Beveridge, Fairmont, for plaintiff Dale F. Morris.

Robert M. Steptoe, Jr., Larry J. Rector, Steptoe & Johnson, Clarksburg, Robert M. Vukas, CONSOL, Inc., Pittsburgh, PA, for defendant Consolidation Coal Co.

Dino S. Colombo, Jacobson, Maynard, Tuschman & Kalur, Morgantown, for defendant Michael R. Schwarzenberg, M.D.

McHUGH, Justice:

The Circuit Court of Monongalia County certified six questions to this Court by an order dated July 14, 1993, which concern whether an opposing party may interview the injured party's physician *ex parte* in a workers' compensation action. The plaintiff below is Dale Morris. The defendants below are Consolidation Coal Company and Michael R. Schwarzenberg, M.D.

I

On July 10, 1991, Mr. Morris claims he was injured while working for Consolidation Coal Company when a board fell off a supply car and hit him on the left leg. He also claims

that he sprained his back at work on the same date when a wheelbarrow he was pushing turned over. Mr. Morris states that he did not report to work on July 11 and 12, 1991, due to his injuries. Mr. Morris was examined by his physician. Below is a chronological list of events which led to this case:

**July 12, 1991:** Dr. Schwarzenberg noted that Mr. Morris had a shoulder/cervical strain and a contusion on his leg. The doctor told Mr. Morris to stay home from work until he returned to the doctor's office on July 16, 1991.

**July 16, 1991:** Mr. Morris returned to Dr. Schwarzenberg, who noted the same symptoms. The doctor ordered that Mr. Morris remain off work until he returned to the doctor's office on July 23, 1991. Mr. Morris canceled the July 23, 1991, appointment and rescheduled it to July 26, 1991.

**July 26, 1991:** Dr. Schwarzenberg noted the same symptoms; however, he indicated that Mr. Morris could return to work on July 29, 1991.

**July 31, 1991:** Mr. Morris returned to Dr. Schwarzenberg's office complaining of pain in his left calf which prevented him from working. Dr. Schwarzenberg ordered him to stay home from work.

**August 12, 20, 30, and September 6, 1991:** On each of these dates Dr. Schwarzenberg ordered the plaintiff to stay home from work after noting the same symptoms. On August 20, 1991, Dr. Schwarzenberg gave Mr. Morris a WC–123 form (a workers' compensation application form) with the physician's portion completed. Mr. Morris completed the WC–123 form and signed it on August 20, 1991. The WC–123 form was eventually filed with Workers' Compensation.

On September 16, 1991, Mark Hrutkay, a representative of Consolidation Coal Company, went to Dr. Schwarzenberg's office and asked to speak to the doctor about Mr. Morris. On that day, Mr. Hrutkay showed Dr. Schwarzenberg pictures and a video of Mr. Morris digging a trench for a water line on July 13, 15, and 16, 1991. Mr. Morris was not informed of the meeting until after it

occurred. However, Mr. Morris has admitted that the photographs and video accurately depict him doing the work.

Dr. Schwarzenberg states that he did not provide any medical information concerning Mr. Morris to Mr. Hrutkay, nor did he or Mr. Hrutkay discuss Mr. Morris' medical condition. Dr. Schwarzenberg states that he simply looked at the pictures and video and when asked what he thought, told Mr. Hrutkay that he was unable to certify Mr. Morris as disabled.

On that same day, Dr. Schwarzenberg wrote a letter to Workers' Compensation stating that he was unable to certify any disability for Mr. Morris from the July 10, 1991, injury based on the photographs and video. On September 23, 1991, Workers' Compensation sent a letter to Mr. Morris rejecting his application for temporary total disability (TTD) benefits based on a finding that Mr. Morris had not been injured in the course of employment.

Consolidation Coal Company suspended Mr. Morris from work on September 17, 1991. Pursuant to the collective bargaining agreement an arbitrator was appointed. The arbitrator upheld Consolidation Coal Company's decision to discharge Mr. Morris from work. Additionally, Mr. Morris attempted to obtain unemployment benefits; however, his application was rejected upon a finding of gross misconduct.

Eventually, Mr. Morris filed a civil action against Dr. Schwarzenberg for breaching his confidential physician-patient relationship by disclosing information to Consolidation Coal Company, and against Consolidation Coal Company for its willful, intentional and malicious interference with his "confidential relationship" with his treating physician. The circuit court certified six questions to this Court after it denied the defendants' motions for summary judgment.

## II

This Court will address the issues raised by the certified questions differently than the circuit court framed the questions.[1] There-

---

**1.** The six questions certified to us are very lengthy. Therefore, we will only provide a sum-

mary of the six questions below:

fore, the first issue is whether West Virginia recognizes a physician-patient privilege when an employee/patient executes a workers' compensation WC–123 medical release and files for workers' compensation benefits. In addition, if this Court does recognize a physician-patient privilege in workers' compensation cases, what is the scope of that privilege?

In syllabus point 1 of *State ex rel. Kitzmiller v. Henning,* 190 W.Va. 142, 437 S.E.2d 452 (1993), this Court stated that "[a] fiduciary relationship exists between a physician and a patient." Additionally, we outlined the parameters of the fiduciary relationship between a physician and a patient in syllabus point 2 of *Kitzmiller:*

> When a patient files a lawsuit in malpractice, he impliedly consents to a physician's releasing medical information related to the condition he has placed at issue. The patient's implicit consent, however, is obviously and necessarily limited; he does not consent, simply by filing suit, to his physician's discussing his medical confidences with third parties outside court-authorized discovery methods, nor does he consent to his physician's discussing the patient's confidences in an *ex parte* conference with the patient's adversary.

In *Kitzmiller* this Court points out that "[t]he danger of *ex parte* interviews of a

doctor by adverse counsel is that the patient's lawyer is afforded no opportunity to object to the disclosure of medical information that is remote, irrelevant, or compromising in a context other than the lawsuit at hand." *Id.* at 145, 437 S.E.2d at 455. However, *Kitzmiller* involved a medical malpractice case and did not involve a workers' compensation proceeding.

The defendants acknowledge that West Virginia has recognized a fiduciary relationship between a physician and patient. However, they argue that this relationship should not prohibit *ex parte* communication between the employer and the claimant's physician in a workers' compensation claim. They point out that there are significant differences between a civil proceeding and a workers' compensation proceeding. For instance, a workers' compensation proceeding is less formal than a civil proceeding: the rules of civil procedure and evidence do not apply in a workers' compensation proceeding. Additionally, we have noted in the past that the purpose of the Workers' Compensation Act "is to provide a simple and expeditious method of resolving the question of disputed claims arising from injuries occurring in the workplace." *Mitchell v. State Workmen's Compensation Com'r,* 163 W.Va. 107, 117, 256 S.E.2d 1, 9 (1979) (citations omitted). *See also Meadows v. Lewis,* 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983).

1. Does West Virginia recognize a fiduciary relationship between a physician and a patient in a workers' compensation context?

2. If so, does a claimant waive the fiduciary relationship by executing a WC–123 form thereby permitting the adversary to have *ex parte* communication with the physician?

3. If the claimant commits a fraud in the attempt to collect workers' compensation benefits, does the fiduciary relationship between the claimant and the physician continue to prohibit *ex parte* contact?

4. If West Virginia does recognize a fiduciary relationship in a workers' compensation proceeding, does such relationship prohibit a physician from reviewing photographs and a video brought in by the adversary and discussing the nature and the dates of the photographs and video and discussing whether the photographs and video indicate that the claimant is disabled with the adversary in an *ex parte* meeting?

5. Does West Virginia recognize a cause of action against the adversary if the adversary in-

duces the physician to breach his fiduciary relationship by bringing *ex parte* photographs and a video of the claimant to the physician and discussing *ex parte* the photographs and the video with the physician?

6. Does West Virginia recognize a cause of action by the patient against the physician if the physician breaches his fiduciary relationship by discussing the photographs and video brought in by the adversary *ex parte?*

The trial court answered questions 1, 3, 4, 5, and 6 in the affirmative and question number 2 in the negative.

We have stated that "we retain some flexibility in determining how and to what extent ... [a certified question from a circuit court to us] will be answered." *City of Fairmont v. Retail, Wholesale, & Dept. Store Union,* 166 W.Va. 1, 3–4, 283 S.E.2d 589, 590 (1980), *citing West Virginia Water Service Co. v. Cunningham,* 143 W.Va. 1, 98 S.E.2d 891 (1957). *See also* syl. pt. 3, *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993).

■ As the defendants point out other jurisdictions have held that in the workers' compensation context, *ex parte* contacts with a claimant's treating physician are permissible in order to expeditiously resolve the claim. *See Morrison v. Century Engineering*, 434 N.W.2d 874 (Iowa 1989); *Booth v. Tektronix, Inc.*, 312 Or. 463, 823 P.2d 402 (1991); and *Holbrook v. Weyerhaeuser Co.*, 118 Wash.2d 306, 822 P.2d 271 (1992). However, not all jurisdictions have found that *ex parte* communication with the claimant's treating physician is acceptable. For instance, in *Church's Fried Chicken No. 1040 v. Hanson*, 114 N.M. 730, 845 P.2d 824 (Ct. App.1992), *cert. denied*, 114 N.M. 577, 844 P.2d 827 (1993), the Court of Appeals of New Mexico focused on the rationale and public policy principles prohibiting *ex parte* contacts between the treating physician and adversarial party in a personal injury action, and found that the rationale and public policy principles should apply equally in a workers' compensation action. The Court of Appeals of New Mexico pointed out that "permitting ex parte interviews by an adversarial party without prior notice to the plaintiff or his attorney, eliminates any safeguards against revelation of matters irrelevant to the action and gives rise to situations permitting breaches in confidentiality between a patient and his treating physician." *Id.* 114 N.M. at 734, 845 P.2d at 828.

We find that reasoning persuasive. Generally, the reasons for recognizing a fiduciary relationship between a physician and patient so as to prohibit *ex parte* communication by the adversarial party outside of court authorized discovery methods outweigh making a workers' compensation claim more expeditious.

Additionally, the defendants contend that even if a fiduciary relationship exists between a physician and the patient in a workers' compensation proceeding, this Court should conclude that the claimant waived this privilege by filing a claim. The defendants point out that Mr. Morris signed a WC–123 form which states: "I acknowledge the provisions of [W.Va.] Code 23–4–7 providing authorization for release of medical information by a physician to my employer or employer representative."

■ *W.Va.Code*, 23–4–7(b) [1991] states, in part, "that any physician may release, to the claimant's employer or its representative, from time to time to such claimant's employer medical reports containing detailed information as to the claimant's condition, treatment, prognosis and anticipated period of disability...." The defendants argue that this *Code* section authorizes *ex parte* communications between the claimant's employer and the claimant's physician. Consolidation Coal Company cites to *Booth*, 823 P.2d at 408, in which the Supreme Court of Oregon, when interpreting a statute similar to ours, stated that there was "no reason to presume a legislative intent to require all reports to be written or to restrict verbal communication between employers or their agents and injured workers' physicians." [2]

However, *W.Va. Code*, 23–4–7 [1991] does not specifically authorize oral discussions by

---

2. Below is the statute which the Supreme Court of Oregon quotes in *Booth*, 823 P.2d at 408 n. 10:
   ORS 656.252(1) provides:
   '(1) In order to insure the prompt and correct reporting and payment of compensation in compensable injuries, the director shall make rules governing * * * reports by attending and consulting physicians and other personnel of all medical information relevant to the determination of a claim to the injured worker's representative, the worker's employer, the employer's insurer and the department. *Such rules shall include, but not necessarily be limited to:*
   '(a) Requiring attending physicians to make the insurer or self-insured employer a first report of injury within a specified time after the first service rendered.
   '(b) Requiring attending physicians to submit follow-up reports within specified time limits or upon the request of an interested party.
   '(c) Requiring examining physicians to submit their reports, and to whom, within a specified time.
   '(d) Such other reporting requirements as the director may deem necessary to insure that payments of compensation be prompt and that all interested parties be given information necessary to the prompt determination of claims.
   '(e) Requiring insurers and self-insured employers to audit billings for all medical services, including hospital services.' (Emphasis added.)

an employer with a claimant's treating physician concerning a claimant's medical condition. In fact, *W.Va. Code*, 23–4–7 [1991], in part, specifically states that a physician may release to the claimant's employer "medical reports[.]" The term "medical reports" implies a written document. Moreover, we decline to follow the Supreme Court of Oregon's interpretation since that would circumvent the public policy principles behind recognizing a fiduciary relationship between a patient and a physician.

Although we decline to open the door to a free exchange of information between the treating physician and the employer, we recognize that in order to resolve a claim more expeditiously there may be times when the employer may need to verbally contact the treating physician. However, this oral *ex parte* communication is limited to the information contained in the written medical reports authorized by *W.Va. Code*, 23–4–7 [1991] or other routine inquiries which do not involve the exchange of confidential information. The claimant's entire medical file, which contains information regarding other physical or mental problems not pertaining to the work-related injury or illness at issue in the workers' compensation claim, is not "fair game" for discussion or review. Furthermore, the treating physician does have a responsibility to restrict what information is given to the employer and that information is limited to the work-related injury at issue in the workers' compensation claim.

The defendants also ask that this Court find that an employer's oral *ex parte* communication with the claimant's treating physician is allowed when the employer is investigating a possible fraud. The defendants point out that the general principle is that "[i]f the patient's purpose in the consultation is an unlawful one ... the law withholds the shield of privilege." John W. Strong, 1 *McCormick on Evidence*, § 99, at 374–75 (4th ed.1992). *See also State v. Garrett*, 8 Ohio App.3d 244, 456 N.E.2d 1319 (1983) (false statement to obtain drugs is not within physician-patient privilege).

Although we disapprove of any fraud and obviously agree that an alleged fraud should be investigated, we do not find that this is a

sufficient reason to ignore the principles behind prohibiting unauthorized *ex parte* communication which involves the disclosure of confidential information between the employer and the claimant's treating physician. As we stated previously, the employer may, in a limited manner, verbally discuss the contents of the written medical reports authorized by *W.Va. Code*, 23–4–7 [1991]. The purpose of allowing such *ex parte* communication is to gather information expeditiously, but not to persuade the treating physician to alter his diagnosis, course of treatment or recommendations. To hold otherwise would open the door to breaching the trust between the treating physician and the claimant which is at the core of the fiduciary relationship between the treating physician and the claimant.

Furthermore, our holding will not end fraud investigations. There are proper ways in which evidence of fraud can be submitted to the Workers' Compensation Fund without the physician having to participate in unauthorized *ex parte* communication. There may be other circumstances in which the physician may have to divulge confidential information when there is an unlawful purpose involved and in which there are no other adequate means to address the problem. However, those circumstances are not before us.

In summary, our holding in this case is limited to unauthorized, *ex parte* oral communications between an employer and the treating physician of a workers' compensation claimant regarding confidential physician/patient information. The key to our holding is balancing two competing interests: the need for confidentiality between the treating physician and the claimant in order to encourage the free exchange of information to facilitate an accurate diagnosis and treatment and the need of the employer to be informed of the claimant's work-related injury. In order to balance those competing interests, this opinion does not preclude communications specifically authorized by law nor does it preclude *ex parte* oral communications between an employer and the treating physician regarding the physician's general diagnosis or recommended treatment of

the claimant's work-related injury or illness based on the written medical reports authorized by *W.Va. Code,* 23–4–7 [1991]. Moreover, *ex parte* oral communications between an employer and the treating physician of a workers' compensation claimant regarding administrative matters, such as when a report will be filed or when a claimant may be released for work, do not involve confidential physician/patient information and are not precluded by this opinion. However, the employer may not contact the treating physician *ex parte* to persuade him to alter his diagnosis, course of treatment, or recommendations. Finally, this opinion does not prohibit execution of an appropriate release by a workers' compensation claimant which specifically permits *ex parte* communication with the claimant's treating physician regarding confidential physician/patient information.[3]

Accordingly, we hold that a fiduciary relationship exists between a treating physician and a claimant in a workers' compensation proceeding. This fiduciary relationship prohibits oral *ex parte* communication which involves providing confidential information and any other *ex parte* communication which involves providing confidential information which is not authorized under the statutes or procedural rules governing a workers' compensation claim between the treating physician and the adversarial party. When a claimant files a workers' compensation claim, he does consent to the release of written medical reports to the adversarial party pursuant to *W.Va. Code,* 23–4–7 [1991]; however, this consent does not waive the existing fiduciary relationship thereby permitting *ex parte* oral communication between the physician and the adversarial party which involves providing confidential information unrelated

to the written medical reports authorized by *W.Va. Code,* 23–4–7 [1991].

### III

■ The next issue raised by the certified questions is whether a patient has a cause of action against the treating physician who has *ex parte* oral discussions with the claimant's employer.[4] Many jurisdictions have recognized that a patient does have a cause of action against a treating physician who divulges unauthorized confidential information. *See generally* Judy E. Zelin, Annotation, *Physician's Tort Liability for Unauthorized Disclosure of Confidential Information about Patient,* 48 A.L.R.4th 668 (1986) and 61 Am.Jur.2d *Physicians, Surgeons, and Other Healers* § 172 (1981). *But see Sievers v. Liberty Mut. Ins. Co.,* 851 S.W.2d 529 (Mo.Ct.App.1992).

In one of the earlier cases to recognize a cause of action against a physician for disclosing confidential information the following rationale was given for extending a cause of action against a physician who breached his fiduciary relationship:

> Thus, during the course of such litigation, in addition to the duty of secrecy, there arises the duty of undivided loyalty. Should a doctor breach either of these two duties, the law must afford the patient some legal recourse against such perfidy. We should not suffer a wrong without a remedy, especially when the wrong complained of involves the abuse of a fiduciary position.

*Hammonds v. Aetna Casualty & Surety Co.,* 243 F.Supp. 793, 799 (N.D.Ohio 1965). *See*

---

3. In order to be effective, however, such release must clearly state that the claimant is waiving physician/patient confidentiality and must specifically state the nature and scope of the information which may be sought by the employer on an *ex parte* basis. Confidentiality between physician and patient is critical to the free exchange of information necessary for accurate diagnosis and treatment. Accordingly, in order to be effective, any waiver must be clear and unambiguous.

4. We are aware that this Court has stated that "we are reluctant to recognize a general cause of

action for the unauthorized disclosure of medical records in the absence of conduct so outrageous as to shock the conscience." *Allen v. Smith,* 179 W.Va. 360, 364, 368 S.E.2d 924, 928 (1988). However, *Allen* was decided before we recognized that a fiduciary relationship exists between a physician and patient. Now that we have recognized that a fiduciary relationship exists between a physician and patient in *Kitzmiller, supra,* it is appropriate to consider what, if any, cause of action is available if there is a breach of that fiduciary relationship.

*also Anker v. Brodnitz,* 98 Misc.2d 148, 413 N.Y.S.2d 582 (N.Y.Sup.Ct.1979), *aff'd,* 73 A.D.2d 589, 422 N.Y.S.2d 887 (1979), *appeal dismissed by,* 51 N.Y.2d 743, 432 N.Y.S.2d 364, 411 N.E.2d 783 and 51 N.Y.2d 703, 432 N.Y.S.2d 1026, 411 N.E.2d 795 (1980). We agree that if a physician does breach his fiduciary relationship to a patient, the patient should have a remedy.

Consolidation Coal Company argues that discovery sanctions are a more appropriate remedy for the breach of a physician-patient fiduciary relationship. Although discovery sanctions may be appropriate, we do not find that this is the sole remedy.

Furthermore, we are not holding today that every divulgence of confidential information by a physician leads to a civil cause of action. For instance, the *Hammonds* court pointed out "that there are some situations where divulgence will inure to the benefit of the public at large or even to the patient himself...." *Hammonds,* 243 F.Supp. at 797 (footnote omitted). *See also* 61 Am. Jur.2d *Physicians, Surgeons, and Other Healers* § 173 (1981).

The West Virginia legislature has found specific situations which warrant disclosure of information in order to protect the public or the individual. For instance, *W.Va. Code,* 16–2–1 [1981] states, in part, that "[i]t shall be the duty of every practicing physician to report to the municipal or county health officer, where there is such official, immediately on diagnosis, those diseases or conditions for which a report is required by the state board of health...." *See also W.Va. Code,* 16–2A–5 [1986]. Additionally, *W.Va. Code,* 49–6A–2 [1992] states, in part, that when

> any medical ... professional ... has reasonable cause to suspect that a child is neglected or abused or observes the child being subjected to conditions that are likely to result in abuse or neglect, such person shall immediately ... report the circumstances or cause a report to be made to the state department of human services....

*W.Va. Code,* 61–2–27 [1992] provides that any medical provider who treats a person for a gunshot wound, knife wound, or other wound which would lead a reasonable person to suspect that the wound resulted from criminal behavior is required to report the injury to a law enforcement agency. A physician is also required to submit to the department of health a written report of any abortion performed on an unemancipated minor. *W.Va. Code,* 16–2F–6 [1984].

The West Virginia legislature has obviously recognized that there are public policy reasons which require the physician to breach his fiduciary relationship to the patient. There may be other reasons which would require the physician to breach his fiduciary relationship which we cannot anticipate today. We do not intend for the above discussion to be an exhaustive list of exceptions to the confidentiality a physician must accord a patient since it is not necessary to the resolution of this case.[5] We are merely

---

**5.** The determination of the existence of public policy in West Virginia is a question of law. Syl. pt. 1, *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984). Additionally, the determination of public policy requires careful thought:

> 'Much has been written by text writers and by the courts as to the meaning of the phrase "public policy." All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what contracts contravene the public policy of the state. The rule of law, most generally stated, is that "public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public

good * * *'' even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.

> The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government—with us—is factually established.

*Id.* at 325, 325 S.E.2d at 114 (*quoting Allen v. Commercial Casualty Ins. Co.,* 37 A.2d 37, 38–39 (1944)).

providing a framework from which attorneys may analyze the issue in the future.[6]

The question now becomes what type of cause of action does the patient have against the treating physician for a breach of the fiduciary relationship. One writer notes that there are four theories upon which recovery may be based for a physician's wrongful disclosure: "(1) breach of the duty of confidentiality; (2) invasion of the right to privacy; (3) violation of statutes concerning physician conduct; and (4) breach of implied contract." Lonette E. Lamb, *To Tell or Not to Tell: Physician's Liability for Disclosure of Confidential Information about a Patient*, 13 Cumb.L.Rev. 617 (1983). *See also* Zelin, *supra.*

A review of the cases which have acknowledged the various causes of actions indicates that there has not been a universal acceptance by the courts of each of the four theories upon which recovery may be based for a physician's wrongful disclosure. We find that the more logical cause of action would be an action for the breach of the duty of confidentiality. After all, when a physician wrongfully discloses information, the right which is violated is the patient's right to have the information kept confidential. Additionally, the principle behind prohibiting unauthorized *ex parte* contacts between the adversary and the treating physician is to prevent the disclosure of irrelevant confidential information.

There are courts which have found that a cause of action for the breach of confidentiality exists when a physician wrongfully discloses patient information. *See Saur v. Probes,* 190 Mich.App. 636, 476 N.W.2d 496 (1991), *appeal denied,* 440 Mich. 872, 486 N.W.2d 739 (1992); *MacDonald v. Clinger,* 84 A.D.2d 482, 446 N.Y.S.2d 801 (1982); and *Littleton v. Good Samaritan Hosp.,* 39 Ohio St.3d 86, 529 N.E.2d 449, 459 (1988). There are courts which have held that there is no recovery for a physician's breach of the duty of confidentiality. *See Collins v. Howard,* 156 F.Supp. 322 (S.D.Ga.1957); *Boyd v. Wynn,* 286 Ky. 173, 150 S.W.2d 648 (1941); and *Quarles v. Sutherland,* 215 Tenn. 651, 389 S.W.2d 249 (1965). However, the courts rejecting recovery under the theory of breach of confidentiality "have done so by relying upon two bases: (1) the common law rule that there is no legally recognized confidential relationship between physician and patient; and (2) the lack of any statute abrogating such common law rule." *Lamb, supra* at 626 (footnote omitted).

Before *Kitzmiller, supra,* the physician-patient privilege was not recognized under common law in West Virginia. *See* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 5.4(G) (2d ed.1986). We have acknowledged that "[t]he history of the common law is one of gradual judicial development and adjustment of the case law to fit the changing conditions of society." *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 340, 256 S.E.2d 879, 884 (1979) (footnote omitted). Therefore, in *Kitzmiller* this Court, in order to meet the current social demands, recognized that there is a fiduciary relationship between a patient and a physician which prohibits the physician

---

**6.** We point out that the Supreme Court of New York provides a strong warning to attorneys:

> Even if no improper pressure were brought to bear on a physician, it would, nevertheless, often be difficult for the defense to determine on its own if and to what extent the physician-patient privilege was waived. Parties may be in substantial disagreement over the kinds of injuries put in issue by the pleadings.... Whether a physical or mental condition is in controversy often requires careful judicial scrutiny and not a mere cursory reading of the complaint.... The determination of whether

a medical condition is in controversy often requires specialized knowledge of the relevant factors which a court may look to in deciding a case.... By restricting disclosure to that obtainable pursuant to statute, court rule, or express consent, the patient's attorney will be afforded an opportunity to object to the disclosure of medical information that is remote, irrelevant, or otherwise improper, the court will be afforded an opportunity to regulate disclosure, and needless lawsuits for breach of confidence will be avoided.

*Anker,* 413 N.Y.S.2d at 585–86 (citations omitted).

from divulging confidential information he has acquired while attending to a patient.

Accordingly, we hold that a patient does have a cause of action for the breach of the duty of confidentiality against a treating physician who wrongfully divulges confidential information.

## IV

■ The last issue raised by the certified questions is whether a patient has a cause of action against a third party who induces the physician to breach his fiduciary relationship by disclosing confidential information. There are fewer cases on this issue than on the previous issue. However, there are courts which have recognized that patients have a cause of action against third parties who have induced a physician to release confidential information. *See Hammonds*, 243 F.Supp. at 803; *Alberts v. Devine*, 395 Mass. 59, 479 N.E.2d 113, 121 (1985), *cert. denied, Carroll v. Alberts*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); and *Anker*, 413 N.Y.S.2d at 585.

Additionally, the *Restatement (Second) of Torts* § 874 cmt. c (1979) states, in part, that "[a] person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused." Comment c of § 874 refers the reader to § 876 which states, in pertinent part:

§ 876.  Persons Acting in Concert

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

. . . .

. . . .

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Therefore, the concept of holding someone who induces a fiduciary to breach his fiduciary relationship is not a foreign concept.

The Supreme Judicial Court of Massachusetts outlines three elements which must be present in order to establish liability for inducing a fiduciary to breach his fiduciary relationship:

To establish liability the plaintiff must prove that: (1) the defendant knew or reasonably should have known of the existence of the physician-patient relationship; (2) the defendant intended to induce the physician to disclose information about the patient or the defendant reasonably should have anticipated that his actions would induce the physician to disclose such information; and (3) the defendant did not reasonably believe that the physician could disclose that information to the defendant without violating the duty of confidentiality that the physician owed the patient.

*Alberts*, 479 N.E.2d at 121 (citations omitted). We find the above to be helpful.

Accordingly, we hold that a patient does have a cause of action against a third party who induces a physician to breach his fiduciary relationship if the following elements are met: (1) the third party knew or reasonably should have known of the existence of the physician-patient relationship; (2) the third party intended to induce the physician to wrongfully disclose information about the patient or the third party should have reasonably anticipated that his actions would induce the physician to wrongfully disclose such information; (3) the third party did not reasonably believe that the physician could disclose that information to the third party without violating the duty of confidentiality that the physician owed the patient; and (4) the physician wrongfully divulges confidential information to the third party.

## V

In conclusion, because the matter was brought to us through certified questions and the facts were not developed below, we do not know based on the record before us

**436**

whether or not Mr. Morris may sustain a cause of action pursuant to the principles set forth in this opinion. The certified questions having been answered, this case is dismissed from the docket of this Court.[7]

Certified questions answered.

---

7. Although not an issue raised by the certified questions, there is one additional issue raised by Consolidation Coal Company. The issue is whether the recognition of a cause of action for the breach of the fiduciary relationship between a physician and patient should apply retroactively. However, since the trial court did not address this issue in the certified questions, we choose not to address it in detail in this case. We note, however, that generally, the opinions of this Court relating to retroactivity issues when new law is set always accord the parties in the case that sets the new law the benefit of that law. *See generally* syl. pt. 5, *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979) and *LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312 (1983), *superseded by statute on other grounds, Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226 (1987).