[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 395.]

BIDDLE ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* WARREN GENERAL

HOSPITAL ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *Biddle v. Warren Gen. Hosp.*, 1999-Ohio-115.]

*Torts—Independent tort for the unauthorized, unprivileged disclosure of nonpublic medical information exists in Ohio—Disclosure of confidential medical information permitted, when—Proof required to establish liability for unauthorized, unprivileged disclosure of nonpublic medical information.*

1.    In Ohio, an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship.

2.    In the absence of prior authorization, a physician or hospital is privileged to disclose otherwise confidential medical information in those special situations where disclosure is made in accordance with a statutory mandate or common-law duty, or where disclosure is necessary to protect or further a countervailing interest that outweighs the patient's interest in confidentiality.

3.    A third party can be held liable for inducing the unauthorized, unprivileged disclosure of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship.  To establish liability the plaintiff must prove that  (1) the defendant knew or reasonably should have known of the existence of the physician-patient relationship, (2) the defendant intended to induce the physician to disclose information about the patient or the defendant reasonably should have anticipated that his actions would induce the physician to disclose such information, and (3) the defendant did not reasonably believe that the physician could disclose that information to the defendant without violating the duty of confidentiality

that the physician owed the patient.

(No. 98-952—Submitted March 30, 1999—Decided September 15, 1999.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Trumbull County, No. 96-T-5582.

_____

{¶ 1} Sometime prior to 1993, appellant and cross-appellee Robert L. Heller, a shareholder in appellant and cross-appellee Elliott, Heller, Maas, Moro & Magill Co., L.P.A. ("the law firm"), attended a legal seminar, where he got the idea that the law firm could assist a hospital in determining whether unpaid medical bills could be submitted to the Social Security Administration for payment. Upon his return, Heller proposed this idea to Rush Elliott, president of the law firm and, at that time, a trustee of Warren General Hospital Foundation and president of Warren General Hospital Health Systems. Elliott asked Mark Tierney, then chief financial officer of appellant and cross-appellee Warren General Hospital ("the hospital"), to meet with Heller.

{¶ 2} In early 1993, a meeting was held resulting in an unwritten agreement under which, according to Tierney, "[t]he law firm would screen potential candidates for SSI [Supplemental Security Income] eligibility and contact those patients on the hospital's behalf as to their rights to apply for SSI Disability, thus having their medical claim covered under SSI and the hospital could, therefore, receive payment for services that it provided that it would otherwise have to write-off [*sic*] as an uncollect[i]ble account, and in return for those services, upon payment from SSI, the hospital would pay a contingency fee to Elliott, Heller & Maas."

{¶ 3} Heller informed the hospital that in order for the law firm to perform this service, it would be necessary for the hospital to provide four pieces of information with regard to each patient to be screened: name, telephone number, age, and medical condition. Accordingly, a joint decision was made to provide the

law firm with the hospital's patient registration forms.

{¶ 4} Over the next two and one-half years, the hospital released all of its patient registration forms to the law firm without obtaining any prior consent or authorization from its patients to do so, and without prescreening or sorting them in any way. The law firm sent a courier to the hospital on a weekly basis to retrieve the forms and bring them back to its office, where they were reviewed by Heller and Sharyn Jacisin, a legal assistant employed by the law firm, and separated according to potential SSI eligibility. The forms of those patients whom the law firm determined not to be eligible for disability benefits were put in a cardboard box and eventually placed in storage, and nothing further was done on those accounts.

{¶ 5} Those patients who were considered potential candidates for SSI were telephoned by either Jacisin or Melanie Sutton, who at that time was Heller's secretary. According to the law firm, neither Jacisin nor Sutton indicated where they worked, but instead stated that they were calling on behalf of the hospital and that "you might be entitled to Social Security benefits that might help you pay your medical bill." Those patients who showed interest were referred to Heller. Jacisin testified at deposition that she made approximately one hundred of these phone calls, the purpose of which was to make an appointment to see if those patients were eligible for Social Security benefits.

{¶ 6} Heller testified that he met with only "[p]robably 5" individuals, that he "absolutely [did] not" tell them that he or his law firm would represent them in making application for benefits, but that these individuals did retain him, without any discussion of compensation, "to help them get their benefits so their medical bills could get paid." However, Elliott testified that it "was more or less the understood agreement * * * between the firm and the hospital" that the hospital was the initial client of the law firm, but "at some point in time" the law firm may come to represent individual patients with regard to their Social Security benefits.

**{¶ 7}** One patient stated by way of affidavit that Sutton telephoned her in July 1993, indicated that she was Heller's secretary, "and stated that the law firm worked closely with Warren General Hospital and  * * * was trying to help Warren General Hospital patients obtain SSI benefits."  She stated that "Sutton asked me to come into the office of Attorney Heller and engage Attorney Heller to represent me regarding a potential Social Security claim."  She also stated that she met with Heller, that neither he nor Sutton said anything regarding her hospital bill or whether it would be paid by SSI, and that she was a Medicaid recipient and her bill had already been paid prior to the communications from the law firm.  Lastly, she stated that even though she never retained the services of Heller or the law firm, "Heller's name appears as my representative on my Social Security denial of benefits letter dated Sept. 29, 1993."

**{¶ 8}** On May 12, 1994, Sutton learned that the law firm was going to terminate her employment and began photocopying the patient registration forms. It appears that Sutton later sent copies of these registration forms to WFMJ-TV in Youngstown, Ohio, and when a reporter for the station confronted the law firm in June 1995, as part of an investigation into breach of patient confidentiality, the relationship between the law firm and the hospital was terminated.

**{¶ 9}** On July 10, 1995, appellees and cross-appellants, Cheryl A. Biddle, individually and as surviving spouse of Robert A. Biddle, and Gary Ball, filed a class action complaint against the hospital, the law firm, Heller, and appellant and cross-appellee Kevin Andrews, who at all pertinent times was the administrator, executive director, and chief executive officer of the hospital.  The complaint seeks compensatory and punitive damages and injunctive relief on behalf of appellees and approximately twelve thousand other patients whose patient registration forms were provided by the hospital to the law firm without prior authorization. Appellees allege several causes of action, all of which are based on the premise that the arrangement between the hospital and the law firm constituted a breach of

4

patient confidentiality. These include claims for invasion of privacy, intentional infliction of emotional distress, and negligence against the hospital and Andrews, and similar claims for inducement against the law firm and Heller. Appellees also assert claims for breach of implied contract and various statutory violations against the hospital and Andrews, and an improper solicitation claim against the law firm and Heller.

{¶ 10} In two separate entries, the trial court (1) issued a protective order precluding appellees from taking the deposition of Melanie Sutton, (2) struck four of appellees' evidentiary exhibits, (3) granted summary judgment in favor of appellants on all claims, and (4) denied as moot appellees' motion for class certification.

{¶ 11} The court of appeals affirmed the judgment of the trial court with respect to its issuance of a protective order and order to strike, but reversed as to summary judgment and, therefore, as to the mootness of class certification. In so doing, the appellate court found most of appellees' stated legal theories to be nonviable in some way, but found that appellees adequately pleaded a claim for tortious breach of confidentiality, which the court expressly recognized as a valid cause of action in Ohio. The court defined this action as an unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.

{¶ 12} The court of appeals rejected appellants' arguments that they did not breach the duty of patient confidentiality because the disclosures were made to a law firm who is required to maintain the confidentiality of its client, and because disclosure was made on a privileged occasion. The court held that "the elements of the tort of breach of confidentiality only require the disclosure of confidential information to any third party, which includes a law firm for the hospital. If hospitals wish to engage in this type of procedure in the future, liability can be avoided by obtaining clear patient consent for this type of informational release."

In addition, the court found that "a physician's disclosure is 'privileged' in those instances when public policy and the Revised Code mandate disclosure," that "the application of a qualified privilege is inappropriate in a case that does not involve defamation," and that even if the privilege could be applied in this case, "the public policy protecting the confidential nature of the physician-patient relationship is more compelling than the public policy permitting certain disclosures to be protected by a qualified privilege."

{¶ 13} The cause is now before this court pursuant to the allowance of a discretionary appeal and cross-appeal.

_____

*Maguire & Schneider, L.L.P., Dennis P. Zapka* and *Emery J. Leuchtag*, for appellees and cross-appellants.

*Jones, Day, Reavis & Pogue, Richard B. Whitney, Kathleen B. Burke* and *Anne Owings Ford; Keating, Keating & Kuzman* and *W. Leo Keating*, for appellants and cross-appellees Warren General Hospital and Kevin Andrews.

*Charles L. Richards*, for appellants and cross-appellees Robert L. Heller and Elliott, Heller, Maas, Moro & Magill Co., L.P.A.

*Bricker & Eckler, L.L.P., James H. Hughes, Jr., Catherine M. Ballard* and *Karen D. Smith*, urging reversal for *amici curiae* OHA: The Association for Hospitals and Health Systems and the Ohio State Medical Association.

*Eugene P. Whetzel,* urging reversal for *amicus curiae* Ohio State Bar Association.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 14} Aside from the procedural and evidentiary questions, these appeals present five general issues for our determination. The first issue is whether a physician or hospital can be held liable for the unauthorized, out-of-court disclosure of confidential information obtained in the course of the physician-patient

6

relationship.

{¶ 15} This issue is easily resolved. "In Ohio, a physician can be held liable for unauthorized disclosures of medical information. See *Hammonds v. Aetna Cas. & Sur. Co.* (N.D.Ohio 1965), 243 F.Supp. 793 [7 Ohio Misc. 25, 34 O.O.2d 138]; *Nationwide Mut. Ins. Co. v. Jackson* (1967), 10 Ohio App.2d 137, 39 O.O.2d 242, 226 N.E.2d 760; *Prince v. St. Francis-St. George Hospitals, Inc.* (1985), 20 Ohio App.3d 4, 20 OBR 4, 484 N.E.2d 265; *Levias v. United Airlines* (1985), 27 Ohio App.3d 222, 27 OBR 262, 500 N.E.2d 370; see, also, R.C. 4731.22(B)(4) ('Willfully betraying a professional confidence' is a ground for physician discipline.); see, generally, Johnston, Breach of Medical Confidence in Ohio (1986), 19 Akron L.Rev. 373." *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 98, 529 N.E.2d 449, 459, fn. 19.

{¶ 16} However, *Littleton* does not specify the basis or legal theory under which a physician can be held liable for unauthorized disclosures of medical information. As one legal writer has observed:

"Faced with situations involving a disclosure of personal information in breach of confidence, some courts have explicitly recognized a breach of confidence tort. Most courts, however, have resorted to a confused tangle of legal theories, including invasion of privacy, implied term of contract, implied private cause of action in statute, and tortious breach of confidence, to make out a cause of action in such situations." Vickery, Breach of Confidence: An Emerging Tort (1982), 82 Colum.L.Rev. 1426, 1437.

{¶ 17} The second issue, therefore, is whether this court should recognize an independent common-law tort of breach of confidence in the physician-patient setting. Since appellants raise no serious argument against the recognition of such an action, this issue need not detain us long either.

{¶ 18} Over eighty years ago, the Supreme Court of Washington stated:

"We shall not go into the question, suggested in respondents' brief, that the

action is improperly designated as one for slander. If the facts set forth in the complaint entitle appellant to relief, it is wholly immaterial by what name the action is called. Neither is it necessary to pursue at length the inquiry of whether a cause of action lies in favor of a patient against a physician for wrongfully divulging confidential communications. For the purposes of what we shall say it will be assumed that, for so palpable a wrong, the law provides a remedy." *Smith v. Driscoll* (1917), 94 Wash. 441, 442, 162 P. 572, 572.

{¶ 19} Since then, courts in Ohio and elsewhere have faced common metamorphic disturbances in attempting to provide a legal identity for an actionable breach of patient confidentiality. In their efforts to devise a civil remedy "for so palpable a wrong," many of these courts have endeavored to fit a breach of confidence into a number of traditional or accepted legal theories. In much the same way as trying to fit a round peg into a square hole, courts have utilized theories of invasion of privacy, defamation, implied breach of contract, intentional and negligent infliction of emotional distress, implied private statutory cause of action, breach of trust, detrimental reliance, negligence, and medical malpractice. Invariably, these theories prove ill-suited for the purpose, and their application contrived, as they are designed to protect diverse interests that only coincidentally overlap that of preserving patient confidentiality. These courts, therefore, often find themselves forced to stretch the traditional theories beyond their reasonable bounds, or ignore or circumvent otherwise sound doctrinal limitations, in order to achieve justice within the parameters they have set for themselves. In so doing, they rely on various sources of public policy favoring the confidentiality of communications between a physician and a patient, including state licensing or testimonial privilege statutes, or the Principles of Medical Ethics of the American Medical Association (1957), Section 9, or the Oath of Hippocrates. Some note that while public policy considerations are a sound enough basis to support liability, a more appropriate basis can be found in the nature of the physician-patient

relationship itself, either because of its fiduciary character or because it is customarily understood to carry an obligation of secrecy and confidence. Slowly and unevenly, through various gradations of evolution, courts have moved toward the inevitable realization that an action for breach of confidence should stand in its own right, and increasingly courts have begun to adopt it as an independent tort in their respective jurisdictions. *Hobbs v. Lopez* (1994), 96 Ohio App.3d 670, 645 N.E.2d 1261; *Howes v. United States* (C.A.6, 1989), 887 F.2d 729 (applying Ohio law); *Neal v. Corning Glass Works Corp.* (S.D.Ohio 1989), 745 F.Supp. 1294 (applying Ohio law); *Levias, supra,* 27 Ohio App.3d 222, 27 OBR 262, 500 N.E.2d 370; *Prince, supra,* 20 Ohio App.3d 4, 20 OBR 4, 484 N.E.2d 265*; Knecht v. Vandalia Med. Ctr., Inc.* (1984), 14 Ohio App.3d 129, 14 OBR 145, 470 N.E.2d 230; *Hammonds, supra,* 243 F.Supp. 793, 7 Ohio Misc. 25, 34 O.O.2d 138 (interpreting Ohio law); *Lujan v. Mansmann* (E.D.Pa.1997), 956 F.Supp. 1218, 1229-1230; *Bullion v. Gadaleto* (W.D.Va.1995), 872 F.Supp. 303; *Morris v. Consolidation Coal Co.* (1994), 191 W.Va. 426, 446 S.E.2d 648; *Mrozinski v. Pogue* (1992), 205 Ga.App. 731, 423 S.E.2d 405; *Saur v. Probes* (1991), 190 Mich.App. 636, 476 N.W.2d 496; *Tighe v. Ginsberg* (1989), 146 A.D.2d 268, 540 N.Y.S.2d 99; *Crocker v. Synpol, Inc.* (Tex.App.1987), 732 S.W.2d 429; *Stempler v. Speidell* (1985), 100 N.J. 368, 374-377, 495 A.2d 857, 860-861; *Alberts v. Devine* (1985), 395 Mass. 59, 479 N.E.2d 113; *Vassiliades v. Garfinckel's* (D.C.App.1985), 492 A.2d 580; *Humphers v. First Interstate Bank of Oregon* (1985), 298 Ore. 706, 696 P.2d 527; *MacDonald v. Clinger* (1982), 84 A.D.2d 482, 446 N.Y.S.2d 801; *Doe v. Roe* (1977), 93 Misc.2d 201, 400 N.Y.S.2d 668; *Horne v. Patton* (1973), 291 Ala. 701, 287 So.2d 824; *Hague v. Williams* (1962), 37 N.J. 328, 181 A.2d 345; *Alexander v. Knight* (1962), 197 Pa.Super. 79, 177 A.2d 142; *Clark v. Geraci* (1960), 29 Misc.2d 791, 208 N.Y.S.2d 564; *Berry v. Moench* (1958), 8 Utah 2d 191, 331 P.2d 814; *Simonsen v. Swenson* (1920), 104 Neb. 224, 177 N.W. 831; Johnston, *supra,* 19 Akron L.Rev. 373; Vickery, *supra,* 82

Colum.L.Rev. 1426; Annotation, Physician's Tort Liability for Unauthorized Disclosure of Confidential Information About a Patient (1986), 48 A.L.R.4th 668; 61 American Jurisprudence 2d (1981) 298-305, Physicians, Surgeons, and Other Healers, Sections 166-173; 24 American Jurisprudence POF 3d (1994) 123, Proof of Unauthorized Disclosure of Confidential Patient Information by a Psychotherapist; 32 American Jurisprudence Trials (1985) 105, Unauthorized Disclosure of Confidential Patient Information.

{¶ 20} We hold that in Ohio, an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship.

{¶ 21} The third issue, as framed by the law firm, "is whether the duty to hold this patient information confidential is absolute, as the Court of Appeals has held, or, whether, and under what circumstances the hospital may disclose the confidential information to others and for what purpose." In particular, appellants and their *amici* argue that a privilege should attach in this case under which a hospital may disclose confidential medical information to its attorney without obtaining prior patient authorization to do so.

{¶ 22} We do not interpret the court of appeals' decision to provide for an absolute duty of confidentiality, but it does contain some language suggesting that a disclosure may be privileged only if mandated by statute. Disclosures of otherwise confidential medical information made pursuant to statutory mandate are certainly privileged, such as occupational diseases (R.C. 3701.25 and 4123.71), diseases which are infectious, contagious, or dangerous to public health (R.C. 3701.24, 3701.52, 3707.06), medical conditions indicative of child abuse or neglect (R.C. 2151.421), and injuries indicative of criminal conduct (R.C. 2921.22). Otherwise, a physician would be forced into the dilemma of violating a statute for failing to report a medical condition to the appropriate state agency or incurring civil liability for disclosing it. Thus, when a physician's report "is made in the

manner prescribed by law, he of course has committed no breach of duty toward his patient and has betrayed no confidence, and no liability could result." *Simonsen, supra*, 104 Neb. at 228, 177 N.W. at 832.

{¶ 23} The physician also has certain duties under the common law to disclose otherwise confidential medical information concerning the public health or safety to third persons, the breach of which can result in civil liability. See, *e.g., Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 301, 673 N.E.2d 1311, 1324; *Jones v. Stanko* (1928), 118 Ohio St. 147, 160 N.E. 456. If a privilege to disclose were held not to attach under these circumstances, the physician would be placed in the untenable position of incurring civil liability for breaching one of two opposing common-law duties.

{¶ 24} More important, the privilege to disclose is not necessarily coextensive with a duty to disclose. "Even without such a legal obligation, there may be a privilege to disclose information for the safety of individuals or important to the public in matters of public interest." *Humphers, supra*, 298 Ore. at 720, 696 P.2d at 535. As one court explained, the duty of confidentiality "is not absolute, and its breach is actionable only if it is wrongful, that is to say, without justification or excuse. Although public policy favors the confidentiality described herein, there is a countervailing public interest to which it must yield in appropriate circumstances." *MacDonald, supra*, 84 A.D.2d at 487, 446 N.Y.S.2d at 805. Thus, special situations may exist where the interest of the public, the patient, the physician, or a third person are of sufficient importance to justify the creation of a conditional or qualified privilege to disclose in the absence of any statutory mandate or common-law duty. See, *e.g., Hague, supra*, 37 N.J. at 336, 181 A.2d at 349; *Berry, supra*, 8 Utah 2d at 197, 331 P.2d at 817-818; *Simonsen, supra*, 104 Neb. at 228, 177 N.W. at 832. See, generally, Johnston, *supra*, 19 Akron L.Rev. at 384-392; Vickery, *supra*, 82 Colum.L.Rev. at 1462-1468.

{¶ 25} We hold that in the absence of prior authorization, a physician or

hospital is privileged to disclose otherwise confidential medical information in those special situations where disclosure is made in accordance with a statutory mandate or common-law duty, or where disclosure is necessary to protect or further a countervailing interest which outweighs the patient's interest in confidentiality.

{¶ 26} The law firm argues that "[i]n the instant case, the interest which needs to be protected by the application of the qualified privilege doctrine, is the free and uninhibited flow of information from a client to an attorney." In support, it relies on *Neal, supra*, 745 F.Supp. at 1297, for the proposition that disclosure is privileged where it is made to another who is also subject to a duty of confidentiality. According to the law firm, the lawyer's duty to preserve the confidences and secrets of a client extends to any confidential information the client may reveal about third persons, including patients. The law firm refers to this as "a closed loop in which confidential or privileged information goes from the patient to the hospital and then from the hospital to its lawyers the duty to keep the confidence encircling everybody involved."

{¶ 27} The hospital and *amicus curiae* Ohio State Bar Association take particular exception to the court of appeals' characterization of the law firm as a "third party" for purposes of the tort of breach of confidence. They argue that an attorney is the agent or "alter ego" of his or her client and, therefore, is not a third party. Since there is a legal identity of the agent with the principal, the hospital was in effect disclosing medical information to itself when it released the patient registration forms to the law firm. According to the hospital, the General Assembly has recognized this principle in R.C. 2317.021 by defining "client" for purposes of the attorney-client privilege statute as a person "who communicates, either directly or through an agent." OSBA adds that liability against either the hospital or law firm in this case would undermine the goals of DR 4-101 and EC 4-1, which, OSBA states, are "(1) to encourage full disclosure by the client; and (2) to allow an attorney to most effectively represent his or her client."

{¶ 28} The main thrust of these arguments is to focus our attention on the nature of the relationship between attorney and client, rather than between physician and patient. From this perspective, the physician's duty to keep patient confidences is irrelevant, and the action itself is viewed as an attack on the viability of the attorney-client relationship. Nevertheless, we are being asked to recognize a privilege under which a hospital can release thousands of patient registration forms without consent or authorization so that a law firm can search for potential Social Security claimants, on the sole basis that the medical bill of one or more of these patients may thereby be paid. Placed in its proper perspective, such a privilege would also protect the individual medical practitioner who releases the bulk of his or her office files without authorization so that a lawyer can search through them for potential workers' compensation or personal injury claimants.

{¶ 29} In *Neal, supra*, 745 F.Supp. at 1297, the court recognized a conditional privilege under which a patient's physician can disclose medical information to another treating physician. In so doing, the court reasoned as follows:

"This Court must conclude that while the disclosure of Plaintiff's test results to Dr. Gullia was technically unauthorized by Plaintiff, Defendant Armacost's actions under the facts of this case could not reasonably be said to constitute a willful betrayal of a professional secret: Defendant Armacost disclosed the medical information *only to the physician otherwise responsible for the treatment of Plaintiff* for conditions manifested in the course of or affecting his employment — *a physician also bound by O.R.C. § 4731.22(B)'s mandate of confidentiality*. Under the analogy to trust law articulated in *Hammonds v. Aetna Casualty* [*& Sur. Co.* (N.D.Ohio 1965), 3 Ohio Misc. 83], 237 F.Supp. [96] at 102, Defendant Armacost as trustee made the [information] available only to another trustee—Dr. Gullia—who also owed *Plaintiff* a fiduciary duty." (Emphasis added.)

{¶ 30} The privilege recognized in *Neal* applies only to disclosures made to

a third party who owes a duty of confidentiality *to the patient, i.e.*, "a physician also bound by O.R.C. § 4731.22(B)'s mandate of confidentiality." It does not extend to disclosures made to a third party who owes a duty of confidentiality to the patient's physician, but not the patient.

{¶ 31} In the present case, the law firm is not bound by R.C. 4731.22(B)(4) or any such statutory mandate that imposes affirmative duties on physicians with regard to their patients. Instead, it is bound by DR 4-101(B) to preserve the confidences and secrets of its client. EC 4-1 makes clear that the lawyer's duty to preserve the confidences and secrets of his client extends to "*one who has employed or sought to employ him.*" (Emphasis added.) In defining "secret," DR 4-101(A) makes clear that the concern is with the wishes of, and the effect disclosure has on, "the client." DR 4-101(C) provides for certain circumstances under which the lawyer may reveal a confidence or secret of his client, all of which involve the interests or actions of the lawyer and the client. The lawyer's duty, therefore, is to keep his client's confidences and secrets, and this duty neither arises out of, nor is it dependent upon, any confidential relationship that may exist between his client and a stranger. In the present case, no attorney-client relationship existed between the law firm and the hospital's patients. Since the law firm was employed by the hospital, and not by the hospital's patients, its duty under DR 4-101 is to preserve the confidences and secrets of the hospital, not the hospital's patients. Thus, the privilege established in *Neal, supra*, is not applicable in this case.

{¶ 32} The hospital's reliance on R.C. 2317.021 and the "alter ego" theory is also misplaced. R.C. 2317.021 has nothing to do with the concept of a unified legal identity between lawyer and client. In fact, the "agent" to whom R.C. 2317.021 refers is someone who communicates to the attorney on behalf of the client, that is, someone other than the attorney. This does not mean that the attorney is never the client's agent; it simply means that R.C. 2317.021 has nothing to do with such a status. In addition, the "alter ego" doctrine may align the identity of

14

principal and agent with regard to their dealings with others, but it does not transform the agent into an acceptable legal repository for the unauthorized disclosure of confidential information that the principal learned within another confidential relationship. In fact, in *Mohan J. Durve, M.D., Inc. v. Oker* (1996), 112 Ohio App.3d 432, 446-447, 679 N.E.2d 19, 28, a patient's ex-physician successfully argued that even *the patient's lawyer* has no right to access his client's medical records unless the client-patient executes a waiver or release or files an action that places her physical condition at issue. In holding that the trial court properly granted the physician's motion for a protective order, the court rejected appellants' argument that the patient's attorney, as her representative, is entitled to her records.

**{¶ 33}** The hospital also relies on the Uniform Health-Care Information Act, approved by the National Conference of Commissioners on Uniform State Laws in 1985, and adopted in Washington and Montana. Under Section 2-104(a)(2) of the Act, a health-care provider may disclose health-care information without the patient's authorization, on a need-to-know basis, to any person "who requires health-care information * * * to provide * * * legal * * * services to the health-care provider." See Wash.Rev.Code 70.02.050(1)(b) and Mont.Code Ann. 50-16-529(2). Even if we assume, *arguendo*, that such a provision would apply under the circumstances of this case, neither Ohio nor the vast majority of the other states have adopted it. See Van der Goes, Opportunity Lost: Why and How to Improve the HHS-Proposed Legislation Governing Law Enforcement Access to Medical Records (1999), 147 U.Pa.L.Rev. 1009, 1067, fn. 58.

**{¶ 34}** Contrary to the assertions of appellants and OSBA, a refusal to recognize a privilege in this case will not sound the death knell of the attorney-client relationship. By withholding a privilege in this case, we do no more than recognize that there are some circumstances under which a hospital can be held liable for the unauthorized disclosure of confidential medical information to its

attorney.

{¶ 35} It is appropriate at this point to step back for a moment and review the facts of this case. A hospital hands over to a law firm thousands of patient registration forms containing information about the medical condition of each patient, including diagnoses of alcohol and drug abuse, mental illness, and sexually transmitted diseases. The law firm reviews these forms for the sole purpose of finding amongst them potential Social Security claimants. The firm then calls these potential claimants and gives them unsolicited advice that they should take legal action in the form of obtaining SSI. In so doing, the law firm either conceals its legal identity or, according to one account, directly asked the potential claimant to engage Attorney Heller to represent her regarding a potential Social Security claim. Those who show interest are scheduled for an appointment with Heller, which is the admitted purpose of making the calls, and the law firm ultimately accepts employment (which Elliott testified was contemplated from the outset).

{¶ 36} We can find no interest, public or private, that would justify the recognition of a privilege under these circumstances.[1] Thus, we agree with the

---

1. There is some discussion in the parties' briefs about the hospital's actions being a collection effort. Johnston, *supra*, 19 Akron L.Rev. at 391, explains:

"In *Patton v. Jacobs* [(1948), 118 Ind.App. 358, 78 N.E.2d 789], an Indiana court held that a physician may disclose the patient's medical bill in an effort to collect an overdue debt. This seems logical, and is probably the law in Ohio, but it is important to note the discussion below concerning the limits placed upon conditional privileges. The type of information which a physician may release to collect a just debt should be limited to that which is necessary to collect the debt."

However, we find it unnecessary to determine in this case whether and to what extent a privilege applies to a debt collection matter. The hospital's disclosures in this case went far beyond that necessary for any mere debt collection effort. Tierney testified that "[i]f the issue was mere delinquency, the only financial information [made] available would be the amount of the bill owed and any payment history and any insurance information would be [made] available to the attorney in that instance." He also stated that in the absence of any SSI benefits, the hospital would write off the accounts as uncollectible. It is also undisputed that the law firm's function was limited to identifying and contacting patients who were potential Social Security claimants, and that once it determined that a patient was not a potential claimant, it would put that patient's form in a cardboard box, place the box in storage, and do nothing further with respect to that account. While it may have been necessary for the hospital to disclose the patient registration forms in order to carry out their plan, it is the plan itself that we find to be unprivileged. The hospital's actions may, only in the

court of appeals that "[i]f hospitals wish to engage in this type of procedure in the future, liability can be avoided [only] by obtaining clear patient consent for this type of informational release."

{¶ 37} This brings us to the fourth issue presented in this case, which is whether the hospital did in fact obtain such consent. The hospital contends that its general authorization for release of information form was sufficient to permit it to disclose the patient registration forms to its attorney. The form provides:

"Authorization is hereby granted to release to my insurance company and/or third party payor such information including medical records as may be necessary for the completion of my hospitalization claims. I understand that the information released upon authority of this authorization may contain information concerning treatment for alcohol, drug abuse, a psychiatric condition, or HIV test results, an AIDS diagnosis, or AIDS-related condition."

{¶ 38} By its express terms, this form authorizes the hospital to release medical information only "to my insurance company and/or third party payor," and then only "as may be necessary for the completion of my hospitalization claims." It does not authorize the release of medical information to the hospital's lawyer, and certainly not for the purpose of determining the patient's status as a potential Social Security claimant.

{¶ 39} The hospital argues, however, that "[i]n the form, the patient told the hospital that it was acceptable to disclose confidential information on an as-needed basis to secure third party payment of the patient's bill." The patient told the hospital no such thing. What the patient told the hospital is that it may "release to my insurance company and/or third party payor such information including medical records as may be necessary for the completion of my hospitalization claims." In

---

broadest possible sense, be characterized as a collection effort, but it is certainly not the kind of collection effort contemplated by those authorities who would grant a privilege to collect an overdue debt.

no way can this language be read to encompass what has occurred in this case.

**{¶ 40}** Moreover, a consent to release medical information must be fairly specific in terms of to whom the release is made. As one court explained:

"Subparagraph (a)(4) of [Ga.Code] § 37-7-166 would have authorized disclosure of the clinical records and the attending psychiatrist's affidavit to the *patient's* attorney if the patient consented to the release. The patient consented to this release, but the release was not made to the patient's attorney; it was made to her mother's attorney. Disclosure of this material was therefore unauthorized under § 37-7-166(a)(4). The release of clinical records and the attending physician's affidavit based thereon was therefore unauthorized." (Emphasis *sic*.) *Mrozinski, supra*, 205 Ga.App. at 736, 423 S.E.2d at 410.

**{¶ 41}** In this case, the hospital's general consent form did not provide the authority to release medical information to the law firm and, therefore, the disclosures were unauthorized.

**{¶ 42}** The fifth and final substantive issue is whether a third party can be held liable for inducing the unauthorized, unprivileged disclosure of nonpublic medical information. Those courts that have considered this issue have answered in the affirmative, and, for the reasons expressed in those decisions, we now do the same. See *Hammonds, supra*, 243 F.Supp. at 803; *Morris, supra*, 191 W.Va. at 435, 446 S.E.2d at 657; *Alberts, supra*, 395 Mass. at 70-71, 479 N.E.2d at 121; *Alexander, supra*, 197 Pa.Super. at 79, 177 A.2d at 146.

**{¶ 43}** The law firm argues that "Attorney Heller needed the information set forth on the patient registration forms to determine which patients might be eligible for the SSI program." We have no doubt of this. In each of the cases cited above, the alleged inducer needed the information for some reason or purpose. However, the inducer's need for the information is irrelevant unless it is to advance or protect some interest giving rise to a privilege.

**{¶ 44}** The law firm also argues that, unlike the above-cited cases, it did not

use the information against the patients. "Here, the information which the law firm obtained from the hospital was to be used to produce a benefit for the patient, *i.e.*, payment of the patients' bill by a third party (Social Security)."

{¶ 45} Properly construed, this argument goes to the question of privilege. As we explained above, there may be special situations where the interests of the patient will justify the creation of a privilege to disclose. However, the only interest that has been recognized in this regard is the patient's interest in obtaining medical care and treatment, and disclosure is limited to those who have a legitimate interest in the patient's health. *Neal, supra*, 745 F.Supp. at 1297; *Hague, supra*, 37 N.J. at 336, 181 A.2d at 349; *Berry, supra*, 8 Utah 2d at 196, 331 P.2d at 817. Otherwise, it is for the patient—not some medical practitioner, lawyer, or court—to determine what the patient's interests are with regard to personal confidential medical information.

{¶ 46} We hold that a third party can be held liable for inducing the unauthorized, unprivileged disclosure of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship. "To establish liability the plaintiff must prove that: (1) the defendant knew or reasonably should have known of the existence of the physician-patient relationship; (2) the defendant intended to induce the physician to disclose information about the patient or the defendant reasonably should have anticipated that his actions would induce the physician to disclose such information; and (3) the defendant did not reasonably believe that the physician could disclose that information to the defendant without violating the duty of confidentiality that the physician owed the patient." *Alberts, supra*, 395 Mass. at 70-71, 479 N.E.2d at 121. See, also, *Morris, supra*, 191 W.Va. at 435, 446 S.E.2d at 657.

{¶ 47} Construing the evidence most strongly in favor of appellees, Civ.R. 56(C), we find that reasonable minds could conclude that the hospital breached its duty of confidentiality owing to appellees and that the law firm induced the hospital

to do so.  Accordingly, we hold that the trial court improperly granted summary judgment as to each appellant, and the decision of the court of appeals is affirmed as to this issue.  Upon remand, the trial court shall, as soon as practicable, proceed to the issue of class certification in accordance with Civ.R. 23.

{¶ 48} As to the procedural and evidentiary issues raised by appellees' cross-appeal, we hold that (1) the issues with regard to the striking of appellees' evidentiary exhibits are rendered moot by virtue of our decision denying summary judgment; (2) the issues with regard to the trial court's protective order precluding appellees from deposing Melanie Sutton are also rendered moot by our decision regarding summary judgment, in light of the trial court's statement that "[i]f either motion for summary judgment is denied, plaintiffs may then move the court for relief from this protective order and for the right to depose Ms. Sutton"; and (3) the trial court acted within the bounds of its discretionary authority in overruling appellees' motion to strike certain "scandalous and indecent matter" contained in the law firm's motion for a protective order.

{¶ 49} Accordingly, the judgment of the court of appeals is affirmed as to these issues, but only for the reasons we have stated.

{¶ 50} Lastly, as to appellees' continued insistence that they be entitled to pursue other theories of liability, we agree with the reasoning of the appellate court that these other theories are either unavailable, inapplicable because of their respective doctrinal limitations, or subsumed by the tort of breach of confidence. Indeed, it is the very awkwardness of the traditional causes of action that justifies the recognition of the tort for breach of confidence in the first place.  While cases may arise in which the facts fall outside the parameters of this tort, but within the parameters of some other theory of liability, this is not such a case.  Thus, the judgment of the court of appeals is affirmed with respect to these issues as well.

{¶ 51} For all the foregoing reasons, the judgment of the court of appeals is affirmed, and the cause is remanded to the trial court for further proceedings

consistent with this opinion.

*Judgment affirmed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in part and dissents in part.

LUNDBERG STRATTON, J., dissents.

_____

**COOK, J., concurring in part and dissenting in part.**

**{¶ 52}** I concur with the majority's recognition of independent torts for the unauthorized disclosure of medical information and for the inducement thereof as set forth in the syllabi. The United States District Court for the Northern District of Ohio recognized these torts more than thirty years ago. *Hammonds v. Aetna Cas. & Sur. Co.* (1965), 243 F.Supp. 793, 7 Ohio Misc. 25, 34 O.O.2d 138. The holding of today's decision is appropriately narrow: it does "no more than recognize that there are some circumstances under which a hospital can be held liable for the unauthorized disclosure of confidential medical information to its attorney." This decision does not apply to disclosure of medical information in the context of the risk management and quality assurance aspects of hospitals and medical facilities. An entire body of law separate from that involved in our inquiry here exists to govern those issues.

**{¶ 53}** I disagree, however, with the majority's decision to rule on the propriety of summary judgment. I would instead remand the cause to the trial court to exercise that judgment after allowing the parties to address the elements of the newly recognized torts.

**Summary Judgment Ruling Should Be Remanded to the Trial Court**

**{¶ 54}** Neither the tort of "unauthorized disclosure of medical information" nor the tort of "inducement of unauthorized disclosure of medical information" was at issue in the trial court; therefore, the trial court did not assess the evidence

presented in light of their elements. We should permit the trial court, now that the issues have been pared down, to be the first to review the case for the propriety of summary judgment. The matter should be remanded to the trial court to be considered from the position that Biddle's complaint states a claim of unauthorized disclosure of medical information and inducement thereof. If the hospital and the law firm wish to move for summary judgment on those claims, they should have that opportunity. The new torts prompt different arguments from the defendants. For example, until the recognition of the new torts, the hospital and the law firm made only passing references to the hospital's consent form because it was unnecessary to resolve the other claims. On remand, the hospital and the law firm may be able to produce evidence that consent was implied from this form, thereby entitling them to summary judgment on the new torts. While both appellate courts have reviewed the consent form, the trial court's judgment gives no indication that it considered the form in granting summary judgment on the pleaded torts.

{¶ 55} Even more important, though, is that with the recognition of the new torts, the issues of causation and damages become very relevant, perhaps dispositive. Prior to recognition of the new torts, it was unnecessary for the hospital and the law firm to argue lack of causation or lack of damages in support of their summary judgment motions because Biddle was grossly lacking support for other elements of the pleaded torts. But under the new tort theories, causation and damages are central to all of the hospital's and law firm's arguments concerning the attorney-client relationship, the inherent confidentiality of that relationship, the lack of publication beyond the law firm (all parties have agreed that the law firm is not responsible for the secretary's stealing the records and turning them over to the television station), and the production of records to the law firm for the patient's benefit. The hospital and law firm should be permitted to make these arguments to the trial court in the context of a summary judgment motion based on the elements of the new torts.

**Conclusion**

{¶ 56} Thus, I concur with the affirmance of the judgment of the appellate court insofar as it recognized the torts of "unauthorized disclosure of medical information" and "inducement of unauthorized disclosure of medical information." And I agree with the majority that the judgment of the court of appeals should be affirmed on the evidentiary issues raised by the cross-appeal.

{¶ 57} I dissent, however, from this court's judgment finding that questions of fact exist as to these two torts — the trial court should have the first opportunity to make such a determination. I would remand the matter to the trial court for proceedings consistent with the recognition that plaintiff's complaint states two new causes of action. If the hospital and the law firm then wish to move for summary judgment on those claims, they should have that opportunity.

_____

LUNDBERG STRATTON, J., dissenting.

{¶ 58} I respectfully dissent. I view this case in simpler terms than the extensive rationale set forth by the majority.

{¶ 59} 1. *An attorney-client relationship existed between the law firm and the hospital.* The *hospital*, not the patients, was the law firm's client. It is immaterial to this case how the firm acquired the hospital as a client. The simple, undisputed fact is that an attorney-client relationship existed between the law firm and the hospital.

{¶ 60} 2. *Because an attorney-client relationship existed, the law firm was an agent, not a third party*. It does not matter whether the release given by the patient authorized the hospital to send the patient files to the law firm. As the hospital's agent, the law firm was entitled to review its client's files and records. The law firm was not a third party according to fundamental agency principles.

{¶ 61} The relationship between a principal and an agent is consensual and fiduciary in nature. *Miles v. Perpetual S. & L. Co*. (1979), 58 Ohio St.2d 93, 95,

12 O.O.3d 106, 107, 388 N.E.2d 1364, 1365; *Connelly v. Balkwill* (1954), 160 Ohio St. 430, 52 O.O. 329, 116 N.E.2d 701. A principal-agent relationship exists "when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks." *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 24 OBR 403, 494 N.E.2d 1091, paragraph one of the syllabus. See, also, *Mermer v. Med. Correspondence Serv.* (1996), 115 Ohio App.3d 717, 721, 686 N.E.2d 296, 299 (law firm acts as agent for its client in securing medical records for litigation). Therefore, as the hospital's agent, the law firm stood in the shoes of its client, the hospital, when it acquired the patient registration forms.

{¶ 62} 3. *The attorney-client privilege encourages the free disclosure of all information between the client and the attorney.* The United States Supreme Court acknowledged this basic principle in *Upjohn v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591, when it stated that "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."

{¶ 63} This principle is also embodied in the Ohio Code of Professional Responsibility at EC 4-1:

"Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system requires the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system."

{¶ 64} The concept is simple, based upon common sense and needs no elaboration. A client must be free to share with its attorney any and all information the client may possess in furtherance of the client's interests.

**{¶ 65}** 4. *The attorney is obligated to preserve all confidences of his or her clients*. Again, this is simple black-letter law. EC 4-1 continues:

"It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance." See, also, DR 4-101(B).

**{¶ 66}** The lawyer's duty to preserve the client's confidences survives the termination of the client-attorney relationship. *Kala v. Aluminum Smelting & Refining Co., Inc.* (1998), 81 Ohio St.3d 1, 4, 688 N.E.2d 258, 262; EC 4-6. This duty also survives the death of the client. *Swetland v. Miles* (1920), 101 Ohio St. 501, 130 N.E. 22. An attorney who discloses privileged information may be subject to disciplinary action, including suspension from the practice of law or disbarment. See *Disciplinary Counsel v. Yurich* (1997), 78 Ohio St.3d 315, 677 N.E.2d 1190. Such privileged information is not subject to discovery. Civ.R. 26(B)(1). An attorney may not be forced to testify concerning information acquired from a client except in certain circumstances. R.C. 2317.02(A). I agree with the expression used by appellants that these restrictions placed upon the attorney create a "closed loop" that fully protects the patient's information.

**{¶ 67}** 5. *The hospital had a right to retain counsel for debt collection purposes.* Whether the law firm's review of the records for potential reimbursement from Social Security was a useful exercise or not is immaterial. The hospital had a right to explore all avenues to seek reimbursement of its expenses. If a patient had government assistance available for payment, the hospital had a right to explore that resource, whether by its internal staff or through an agent.

**{¶ 68}** I fear that the majority opinion will severely impair the ability of a hospital to function through its many agents. The lines of this decision are so fluid

that it will be impossible to know when and where this new tort of "breach of confidentiality" has been committed. *Amici curiae* identify a number of agents upon whom hospitals must rely to conduct its business—auditors, billing agents, claim form preparers, debt collectors, researchers, discharge planners, peer review boards, consultants, vendors, technology assistants, and volunteers—all of whom may be affected by this expansive opinion. Conversely, a patient release form must now be so broad and encompassing as to be virtually meaningless.

{¶ 69} Attorneys may face similar constraints now that they will be viewed in terms of third parties and not agents of their clients. Attorneys may now be subject to potential liability for "inducing" a client to reveal to them privileged information that the *client* possesses. It may now be necessary for an attorney to advise a client that, because of all the privileges and confidential information that the client potentially may have, the client should *not* disclose everything to the attorney in order for *both* the attorney and the client to avoid potential liability for breach of a confidence. Such a scenario, however absurd, is now only too real. I believe the majority's opinion will severely curtail full and frank disclosure of information between an attorney and a client.

{¶ 70} I also question how to measure damages in a breach of confidentiality case. The majority remands this cause to the trial court for consideration of class certification. What damages could have been incurred from a cursory review of a patient's hospital registration form that eventually ended up back in storage? The real culprit in this case is the disgruntled employee who took the records and turned them over to a television station. How can the law firm be liable for such theft and the callous disregard of the patients' rights? Don't the employee's actions break the chain of causation? I wonder how severely traumatized were the few patients who were contacted by the law firm offering to help them secure government benefits? Assuming *arguendo* that a tort had been committed, I fail to see any resulting damages.

26

{¶ **71**} There is no need to create a new tort because sufficient remedies for the unauthorized, unprivileged disclosure of nonpublic medical information to a third party already exist under current law.  I believe that the issues of "inducing the unauthorized, unprivileged disclosure of nonpublic medical information" and "qualified privilege" are red herrings and not material.  The extent of the patient release given to the hospital is not an issue.  This is simply a case about a hospital's right to provide information, albeit confidential patient information, to its lawyers for review and the lawyers' corresponding right to hold this information in confidence.  No more.

{¶ **72**} I concur with Justice Cook's dissenting opinion that, at the very least, this court should remand this matter to allow the parties to proceed to litigate the merits of the case in light of this newly created tort.  Due process requires such a remand.

{¶ **73**} For these reasons, I respectfully dissent.

_____