ROE et al., Appellees,

v.

PLANNED PARENTHOOD SOUTHWEST OHIO REGION et al., Appellants.

[Cite as *Roe v. Planned Parenthood Southwest Ohio Region*, 173 Ohio App.3d 414, 2007-Ohio-4318.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–060557.

Decided Aug. 24, 2007.

Crabbe, Brown & James, L.L.P., Brian E. Hurley, Kathleen McGarvey Hidy, and Robert J. Gehring, for appellees.

Vorys, Sater, Seymour & Pease, Daniel J. Buckley, and Barbara Bison Jacobsen, for appellants.

MARK P. PAINTER, Presiding Judge.

{¶ 1} Are abuse reports and medical records of minors under the age of 13 receiving abortions discoverable, in an identity-cloaking format, by private civil plaintiffs when the records are not necessary to develop the plaintiffs' claims? We think not.

{¶ 2} Plaintiffs-appellees, John and June Roe, individually and as parents of Jane Roe (collectively "the Roes"), sued defendants-appellants, Planned Parenthood Southwest Ohio Region, Roselyn Kade, M.D., and John Does one through six (collectively "Planned Parenthood"), for performing a wrongful abortion on Jane Roe. John Does one through six represent various Planned Parenthood employees. The complaint alleged that Planned Parenthood had performed an unlawful abortion on Jane Roe because it had neither notified the parents nor secured their consent before the abortion;[1] that it had not obtained Jane's informed consent;[2] and that it had breached its duty to report suspected child abuse.[3] The Roes sought compensatory and punitive damages, as well as injunctive relief.

## I. The Illicit Relationship and Jane's Fraudulently Procured Abortion

{¶ 3} In the fall of 2003, Jane engaged in a sexual relationship with her 21–year–old soccer coach, John Haller. At the time, Jane was 13 and in the eighth grade. The sexual relationship continued through 2004, and in March of that year, Jane discovered that she was pregnant.

{¶ 4} Jane told Haller. Haller convinced Jane to have an abortion. Later in March, Haller called Planned Parenthood and attempted to schedule an abortion

---

1. R.C. 2919.121 and 2919.12.

2. See R.C. 2317.56.

3. See R.C. 2151.421.

for Jane. Planned Parenthood told Haller that he could not schedule the abortion and that Jane would have to call to make the appointment. After his conversation with Planned Parenthood, Haller called Jane and told her to schedule the abortion. And he also instructed her that if she was asked to provide a parental telephone number, she should give Planned Parenthood his cell-phone number in lieu of her father's phone number.

{¶ 5} Jane called Planned Parenthood, and during her conversation, she told a worker that she was 14 and that her parents could not accompany her to the abortion. She also asked whether her "step-brother" could come with her. The worker asked whether Jane's parents knew about her pregnancy. Jane lied and told the worker that one or both of her parents knew. They did not. The worker then told Jane that someone would have to stop at Planned Parenthood to pick up an information packet, but that Jane did not have to personally retrieve the packet. At some point during the conversation, Jane gave the worker her father's correct name and address, but she lied twice more, telling the worker that her father did not have a home phone number and then giving Haller's cell-phone number as her father's phone number. Planned Parenthood scheduled the abortion for March 30, 2004.

{¶ 6} Sometime before the abortion, Haller picked up the information packet for Jane. Several days after Jane's initial conversation with Planned Parenthood, she called again because she could not find her Social Security card, but the worker told her that another form of identification could be used.

{¶ 7} The parties' assertions of fact diverge as to whether Planned Parenthood called the misleading phone number given by Jane. The Roes' second amended complaint alleged that they were without knowledge whether "Planned Parenthood called or attempted to call the cell phone that belonged to Haller or, if it did, whether Planned Parenthood ever spoke to Haller." But at a hearing, Planned Parenthood read into evidence without objection the following transcript of the investigative officer's discussion with Jane Roe:

{¶ 8} "[JANE ROE]: I told [Planned Parenthood], to call [Haller's] cell phone number. I acted like it was my dad's cell phone. And when they called him, he was acting like my dad and told them that I was allowed to do it or whatever.

{¶ 9} "[THE DETECTIVE]: So they called. You gave your dad's cell phone number?

{¶ 10} "[JANE ROE]: No, I gave them [Haller's] cell phone number, but I told them it was my dad's."

{¶ 11} Planned Parenthood also produced the parental-notification form filled out by Dr. Kade. The form indicated that Kade had telephonically notified parent

John Roe that Jane Roe was scheduled for an abortion at Planned Parenthood no sooner than 24 hours from the time the notice was given.

{¶ 12} On the day of the abortion, Haller drove Jane to the abortion clinic, and on arrival, a worker requested to see both Haller's and Jane's identification. Jane presented her school-identification card, and Haller provided his Ohio driver's license.

{¶ 13} Haller reviewed the forms Jane had filled out to be sure that they had been completed in a satisfactory manner. The forms were submitted to Planned Parenthood, and one worker noted on a form that Jane Roe's "brother John * * * [was] here today." Haller used his credit card to pay for the abortion.

{¶ 14} Before the abortion, Jane signed a form setting forth the nature and purpose of, and the medical risks associated with, a dilation-and-sharp-curettage abortion. One form she signed also stated that Planned Parenthood had met its statutory obligation to obtain the patient's informed consent.[4] The Roes alleged that even if Jane had been fully informed, her age and emotional state precluded her from comprehending and understanding the risks associated with the abortion. The Roes also alleged that Jane's consent was not given in a knowing, voluntary, or intelligent manner and that it was procured under duress and coercion.

{¶ 15} After the abortion, a Depo–Provera shot was administered to Jane, and she was given condoms. Haller and Jane resumed their sexual relationship. But within three days of the abortion, Haller ended the relationship. After the breakup, Jane and Haller's sister, also a classmate of Jane's, had an argument about Haller and his relationship with Jane. A teacher overheard the argument, including the references to Jane's sexual relationship with Haller, and reported the suspected sexual abuse to the police.

{¶ 16} After a criminal investigation, Haller was convicted of seven counts of sexual battery. A criminal investigation was also conducted into Planned Parenthood's culpability, but the Hamilton County Prosecutor chose not to prosecute Planned Parenthood for any statutory violation.

{¶ 17} The Roes sued and moved to compel discovery of ten years' worth of minors' abortion records. The abortion records contained information about each patient's sexual and gynecological history, number of sexual partners, contraceptive methods, and general medical history. The trial court compelled discovery of the records in an identity-concealing format, concluding that the Roes' interest in the records was "tremendous," and that the civil rules, the statutes, and the case law weighed in favor of disclosure.

---

4. See R.C. 2317.56(B)(4).

{¶ 18} The management of the discovery process is reviewed under an abuse-of-discretion standard, but questions of privilege, including the propriety of disclosure, are questions of law and are reviewed de novo.[5]

## II. The Statutory Prohibitions and the Roes' Complaint

{¶ 19} The Roes' complaint alleged violations of former R.C. 2919.12 (parental notice), current R.C. 2919.121 (parental written consent), R.C. 2151.421 (failure to report suspected abuse of a minor), and R.C. 2317.56 (patient's informed consent). We discuss these sections of the Revised Code in turn, first noting that to determine the limitations on the scope of discovery, we must evaluate the Roes' allegations and claims before analyzing the necessity and probative value of the information sought to be discovered.

## III. The Former Notice Statute

{¶ 20} Former R.C. 2919.12 ("the notice statute") prohibited any person from knowingly performing an abortion on a pregnant minor unless the person had given at least 24 hours' actual notice, in person or by telephone, to one of the minor's parents of the intent to perform the abortion.[6] Therefore, under the notice statute, at a minimum, Planned Parenthood was required to give 24 hours' telephonic notice of the abortion to a parent before performing the abortion. Even though Jane had misinformed Planned Parenthood about her father's phone number, the Roes alleged that Planned Parenthood had failed to give them telephonic notice as required by the statute.

{¶ 21} The heart of the Roes' notice claim is that the statute required actual notice. The parties do not dispute that the Roes did not receive notice. Though the statute required actual notice to the parents, it enumerated several affirmative defenses when the pregnant minor had given false, misleading, or incorrect information. And Jane's testimony showed that she had lied to Planned Parenthood when she gave it Haller's, rather than her father's, phone number.

## IV. The Consent Statute Was Enjoined

{¶ 22} The notice statute was amended in 1998 by H.B. No. 421, which enacted the notice statute's successor, R.C. 2919.121 ("the written-consent statute"). The written-consent statute requires that the attending physician secure the informed written consent of the minor and one parent before performing an abortion.[7] In

---

5. See *Alcorn v. Franciscan Hosp.,* 1st Dist. No. C–060061, 2006-Ohio-5896, 2006 WL 3231208.

6. See former R.C. 2919.12.

7. See R.C. 2919.121.

addition to requiring written consent of a parent, H.B. No. 421 also provided a statutory affirmative defense to any civil, criminal, or professional-disciplinary action under R.C. 2919.121 if enforcement of the written-consent statute has been enjoined: If a person complies with the [notice statute] in the good-faith belief that the application or enforcement of the written-consent statute is subject to a restraining order or injunction, good-faith compliance is a complete defense to any civil, criminal, or professional disciplinary action brought under the written-consent statute.[8]

{¶ 23} The Roes assert that the same facts that supported their claim under the notice statute support their claim under the parental-written-consent statute. But the constitutionality of H.B. No. 421 was immediately contested, and enforcement of the statute was preemptively enjoined in federal district court before its effective date.[9] In 2005, the district court upheld the constitutionality of H.B. No. 421 and ruled that it would go into effect in September 2005. To summarize, H.B. No. 421 was enjoined, and the act suspended, in 1998, Jane's abortion was performed on March 30, 2004, and H.B. 421 was ruled constitutional and became effective in September 2005.

{¶ 24} Because R.C. 2919.121 was enjoined from becoming Ohio law at the time the underlying action accrued, discovery under the Roes' R.C. 2919.121 claim was unwarranted. Notwithstanding this, if Planned Parenthood had complied with R.C. 2919.12 in the good-faith belief that R.C. 2919.121 had been enjoined, then civil, criminal, or professional-disciplinary actions under R.C. 2919.121 were precluded. Even if we were to assume that the enforcement of the written-consent statute was not enjoined as to the Roes, the affirmative defense required only a good-faith belief that R.C. 2919.121 had been enjoined, and the record before us does not reflect a lack of good faith in Planned Parenthood's belief that enforcement of the statute had been enjoined, because it had been.

## V. The Duty to Report Suspected or Known Abuse

{¶ 25} Under R.C. 2151.421 (the duty-to-report-abuse statute), certain officials and agencies have a duty to report suspected abusive or illegal relationships to a law-enforcement agency or a prosecuting attorney. The Roes alleged that Planned Parenthood had failed to report Jane's relationship with Haller to a law-enforcement agency or a prosecuting attorney.

{¶ 26} The Roes' memorandum supporting their motion to compel stated that their discovery requests sought "production of information that relates directly to

---

8. See R.C. 2919.122.

9. See *Cincinnati Women's Serv., Inc. v. Voinovich* (1998), S.D.Ohio No. C-1-98-289.

the claims they have made, the punitive damages and injunctive relief they seek, and the defenses Planned Parenthood and Kade have raised in their answer and counterclaim." But the closest the Roes came to explaining how the abortion records related to their claims was their allegation that " 'as a matter of policy and/or pattern and practice Planned Parenthood does not meet its reporting duties under R.C. 2151.421 with respect to minors to whom it provides abortion and other medical services, including the provision of birth control.' (¶ 40 of the Second Amended Complaint) (This allegation is based on what occurred in this case, information [p]laintiffs have learned from the Hamilton County, Ohio Prosecutor's Office, and the investigations of Planned Parenthood currently being conducted by the attorney generals of Nebraska and Indiana)[.] The failure to report suspected abuse by entities and persons covered by R.C. 2151.421 is a crime, and defendants may not hide behind the assertion of privilege to prevent [p]laintiffs from discovering the information they need to establish that their breach of this duty in this case was not an isolated incident."

{¶ 27} The Roes alleged that Planned Parenthood had breached its duty to report suspected abuse, and claiming a systematic and intentional breach of that duty, the Roes attempted to justify their request for the abortion records.

{¶ 28} Planned Parenthood did not deny that it had not filed an abuse report. And we note that reports made under R.C. 2151.421, and the information contained therein, are confidential and inadmissible as evidence in any civil proceeding.

### VI. The Duty to Secure the Patient's Informed Consent

{¶ 29} Under R.C. 2317.56 (the patient's-informed-consent statute), absent a medical emergency, at least 24 hours before an abortion is performed, a physician must meet with the pregnant woman to (1) allow her an opportunity to ask questions, (2) inform her of the nature and purpose of, and the medical risks associated with, the abortion, (3) tell her the probable gestational age of the fetus, and (4) advise her of the medical risks associated with carrying the pregnancy to term.

{¶ 30} Under the patient's-informed-consent statute, the meeting need not occur at the facility where the abortion is to be performed or induced, and the physician involved in the meeting need not be affiliated with that facility or with the physician who is scheduled to perform or induce the abortion.[10] Moreover, the Ohio Attorney General has opined, "The provision of information at least twenty-four hours in advance must be made 'verbally or by other nonwritten means of communication,' but need not occur in a face-to-face meeting * * *.

---

10. See R.C. 2317.56.

'[V]erbally or by other nonwritten means of communication' * * * refer[s] to all types of nonwritten communication, including videotaped or audiotaped physician statements." [11] The statute also authorizes the court to order injunctive and equitable relief where appropriate. This was the only one of the Roes' statutory claims that specifically provided for injunctive relief.

{¶ 31} The Roes alleged that Planned Parenthood had failed to meet with Jane and convey the information required under R.C. 2317.56.

## VII. The Scope of Discovery Under Civ.R. 26

{¶ 32} Civ.R. 26 limits the scope of discovery to "any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." In determining the scope of discovery, we focus not on whether the information requested is admissible, but on whether the information sought is reasonably calculated to lead to admissible evidence.[12] In sum, the scope of discovery is limited to relevant nonprivileged matters that are reasonably calculated to lead to admissible evidence. But even privileged matters are subject to discovery when it is necessary to protect or further a countervailing interest that outweighs the privilege.[13]

{¶ 33} For this discussion, we assume without so holding that the discovery sought by the Roes was relevant and reasonably calculated to lead to admissible evidence. The abuse reports and abortion records were unquestionably confidential and privileged under the physician-patient privilege.[14] But whether the information sought was relevant or reasonably calculated to lead to admissible evidence is not clear, and because our discussion of the parties' interests is dispositive of the issue, we limit our analysis to whether the discovery sought was necessary to protect or further a countervailing interest that outweighed the minors' privilege.

## VIII. Necessity

{¶ 34} Disclosure of privileged information is appropriate only when necessary.

---

11. 1994 Ohio Atty.Gen.Ops. No. 94–094.

12. See *Richards v. Kerlakian*, 162 Ohio App.3d 823, 2005-Ohio-4414, 835 N.E.2d 768, ¶ 7; Civ.R. 26(B)(1).

13. See id., citing *Biddle v. Warren Gen. Hosp.* (1999), 86 Ohio St.3d 395, 715 N.E.2d 518, paragraph two of the syllabus.

14. See R.C. 2151.421(H)(1) and 2317.02; *Richards v. Kerlakian,* supra.

The Ohio Supreme Court held in *Biddle v. Warren Gen. Hosp.*,[15] and we later held in *Richards v. Kerlakian*,[16] that only where the privileged information is necessary to further or protect a countervailing interest is disclosure proper.

{¶ 35} In *Richards*, the plaintiff sued her deceased son's physician and the employer hospital under a negligent-credentialing theory. The plaintiff sought discovery of redacted copies of operative reports of nonparty patients. The medical records belonged to the defendant physician's former patients who had undergone the same gastric-bypass surgery. The issue was whether the hospital knew or should have known that the physician was incompetent to perform the surgery. We upheld the trial court's order compelling discovery, noting that though the records were privileged under R.C. 2317.02, they were nonetheless necessary to develop a primary claim against the hospital on the issue of negligent credentialing and to impeach the deposition testimony of the defendant physician. And in that instance, the plaintiff's interests outweighed the patients' interest in confidentiality.

{¶ 36} In this case, the Roes alleged that the abortion records were necessary to further their core claims. Not so.

{¶ 37} The Roes first argue that the records were necessary to establish punitive damages. But the duty-to-report-abuse statute does not provide for punitive damages.[17] Because R.C. 2151.421 does not provide for punitive damages, the Roes' punitive-damages justification under R.C. 2151.421 is without merit.

{¶ 38} On the other hand, the parental-notice statute[18] and the patient's-informed-consent statute[19] provide that punitive damages are available for a single violation[20] and the Roes admit as much. Because punitive damages are available for one violation, the medical records (used to show intentional and systematic violations in the past) were unnecessary to the Roes' claim for punitive damages. The Roes must only show that Planned Parenthood violated its statutory duties to them one time for punitive damages to be calculable. And even if it is assumed that the medical records were necessary for the computation

---

15. *Biddle v. Warren Gen. Hosp.* (1999), 86 Ohio St.3d 395, 715 N.E.2d 518.

16. *Richards v. Kerlakian*, 162 Ohio App.3d 823, 2005-Ohio-4414, 835 N.E.2d 768.

17. See R.C. 2151.421.

18. See R.C. 2919.12.

19. See R.C. 2317.56.

20. See R.C. 2919.12(E) and 2317.56(H)(1).

of punitive damages (which in itself is speculative at this stage of the proceedings), we hold that a private plaintiff's interest in attempting to bolster a speculative punitive-damages award alone does not outweigh the patients' interest in maintaining confidentiality.[21]

{¶ 39} The key in any analysis of a discovery dispute is to first determine what truly is at issue. Once that is done, we can determine what is discoverable.

{¶ 40} This is not a class action. This is not a criminal case. It is *Roe v. Planned Parenthood* —not *State v. Planned Parenthood.* The issue is not whether Planned Parenthood violated its duties to other patients—it is whether Planned Parenthood violated its duties to the Roes. No amount of "issue framing" to the contrary can change that fact. The redacted medical records were not necessary for the Roes to establish whether Planned Parenthood had violated Ohio statutes in its treatment of Jane. Though the Roes alleged that Planned Parenthood had systematically and intentionally violated Ohio law, they offered no evidence to support this artifice—and the record is devoid of any. Even if the Roes rooted around in these patients' medical records and found evidence that Planned Parenthood had violated Ohio law 1,000 times, it would not assist the Roes in showing that Planned Parenthood had violated Ohio law in Jane's case. The attempt to interject nonparty medical abortion records into a private civil suit by claiming systematic and intentional violation of Planned Parenthood's statutory duties is clearly at odds with the nature of this case.

{¶ 41} Further, this case provides no persuasive reason for a judicial endorsement of the Roes acting as private attorneys general. If the state reasonably believed that Planned Parenthood had systematically and intentionally violated its duties under Ohio law, it could have sued or prosecuted. And even then it is not certain that Planned Parenthood would have been required to disclose the confidential information sought here.[22] The facts and evidence nowhere indicate that Planned Parenthood systematically and intentionally evaded its statutory duties. And if Planned Parenthood was violating Ohio law, then those same statutes provided a private cause of action for each aggrieved party.

{¶ 42} A separation of the wheat from the chaff reveals that this case is about whether Planned Parenthood performed an unlawful abortion on Jane; about whether Planned Parenthood met its duty to report suspected abuse of Jane; and about whether Jane's consent was proper. The Roes' interests are important.

---

**21.** See, e.g., *Sirca v. Medina Cty. Dept. of Human Servs.* (2001), 145 Ohio App.3d 182, 186–187, 762 N.E.2d 407.

**22.** See, e.g., *Planned Parenthood of Indiana v. Carter* (Ind.App.2006), 854 N.E.2d 853.

And the minor patients' privilege is undeniable. But the information sought was not necessary to this case.

{¶ 43} Even if the records were even tenuously necessary, the burden of disclosure on Planned Parenthood and its patients would exceed the value of the records to this litigation.

{¶ 44} The potential invasion of privacy rights trumps the probative value of the records to this case. Even with the records redacted, it is arguable that disclosure would result in a privacy invasion. For instance, in the same vein that a voyeur observing in secret invades the subject's privacy—even if the subject's identity is not known—an abortion patient's privacy rights can be encroached by the nonconsensual review of redacted abortion records. In this case, nondisclosure was compulsory notwithstanding that the patients' identities would have been concealed by redaction, or that it would have been impossible to extrapolate a patient's identity from the redacted records—otherwise a privacy invasion would arguably be visited on the unconsenting, unrepresented, nonparty patients; and under such a meager showing of necessity, we refuse to order disclosure. And we are unsure that a sufficient redaction is even possible—identities might be compromised.

{¶ 45} Because of the lack of necessity, we need not further address or weigh the parties' interests, except that we acknowledge and recognize that, under the proper circumstances, the physician-patient privilege [23] between an abortion patient and her physician may be afforded constitutional protection under the penumbra of privacy rights.[24]

{¶ 46} The Roes need only prove that Planned Parenthood violated its duty to the Roes in this case—no more, no less. Whether Planned Parenthood has violated Ohio law in the past bears no relevance to, and is not necessary in determining, whether Planned Parenthood violated the law as to Jane. Likewise, the records are not necessary for either punitive damages or injunctive relief.

{¶ 47} The order of the trial court compelling discovery is reversed, and the cause is remanded for further proceedings.

Judgment reversed
and cause remanded.

HILDEBRANDT and CUNNINGHAM, JJ., concur.

---

23. R.C. 2317.02(B).

24. See *State v. Desper,* 151 Ohio App.3d 208, 2002-Ohio-7176, 783 N.E.2d 939, ¶ 32; *Roe v. Wade* (1973), 410 U.S. 113, 151–157, 93 S.Ct. 705, 35 L.Ed.2d 147; *Whalen v. Roe* (1977), 429 U.S. 589, 598–601, 97 S.Ct. 869, 51 L.Ed.2d 64.